ALEXANDER MACKENZIE et al., respondents,

*v.*

THE TRUSTEES OF THE PRESBYTERY OF JERSEY CITY, appellants.

[Argued March 9th, 1904. Decided September 22d, 1905.]

1. Words seemingly appropriate to a condition only may introduce a covenant, a condition or a declaration of trust, and the whole clause, in its form and scope, must be considered in order to determine within which class it should fall.

2. All of the words in the clause in question being considered, and the absence of words of determination or reverter being noticed, the intent of the parties, to be exercised as permitted by the principles of law, will be best subserved by holding the clause to be a declaration of trust.

3. The trust which is thus declared is for public worship and instruction for the benefit of an indefinite number of persons, according to Presbyterian faith and polity, with certain added provisions, now not to be weighed; nevertheless, the trust appears to be good, as a charity, in both its primary and secondary limitations.

4. Such a trust is enforceable, in this state, either exactly or under the doctrine of *cy pres*, approximately.

5. Upon their own showing, the present complainants have no standing in court by right of a reverter, or as being in themselves possible beneficiaries, or under the doctrine of visitation; only the attorney-general, by way of information, or the presbytery, by bill exhibited by and through the body charged with the duties of trusteeship, can properly invoke the superintending power of the courts over the administration of the trust.

6. The decree of the court of chancery must be reversed, and the bill should be dismissed.

On appeal from chancery.

This was a suit in equity brought by Alexander MacKenzie, Hugh R. MacKenzie, Edward E. MacKenzie, James S. MacKenzie, Grace Ewing, Jessie Alexander, Isabella Craig, Rebecca E. Vanderbeck, Margaret R. Elkin, Rebecca M. Laidlaw and Catherine M. Pierson, devisees and heirs-at-law of George R. MacKenzie, deceased, and Alexander MacKenzie, Hugh R. MacKenzie, Peter Alexander and Charles Elkin, executors and trustees named in the will of the said George R. MacKenzie, deceased, against The Trustees of the Presbytery of Jersey City.

The bill of complaint alleged that by a deed of the 6th day of May, A. D. 1885 (afterwards delivered, acknowledged and recorded), George R. MacKenzie and Rebecca, his wife, for the consideration of one dollar, bargained and sold and conveyed unto the Trustees of the Scotch Presbyterian Church of Jersey City (a corporation under the Religious Societies Act), and their successors and assigns, with unlimited covenants for title, certain lands and tenements situate on the northerly side of Mercer street, Jersey City, New Jersey, distinguished as lots 22, 23 and 24, in block 65 on the map of the farm of Cornelius Van Vorst, deceased, with the appurtenances thereunto belonging,

"to have and to hold all and singular the above-mentioned and described premises, together with the appurtenances, unto the said party of the second part, its successors and assigns, to its own proper use, benefit and behoof forever, *on condition* that the said party of the second part, the religious society now worshiping in the church erected upon said premises shall be called, and always continue to be called, the Scotch Presbyterian Church of Jersey City, and the corporate name to be continued as it now legally is; also, that the said corporation shall keep at all times said church and premises in proper repair; also, that no instrumental music shall at any

time be used in the worship of the church; and, further, should it become actually necessary to sell said premises at any time that the proceeds of such sale shall be devoted to the same religious purpose by the same organization and upon the like conditions as herein stated; and on further condition that the church organization shall be under the care of the Presbytery of Jersey City, and its legitimate Presbyterian successors, and, if the above conditions are not complied with on the part of the party of the second part hereto, the said premises are to vest in the Presbytery of Jersey City, and its legitimate Presbyterian successors, for Presbyterian religious purposes, upon the same conditions aforesaid; and on further condition that there shall be no lien upon the said premises, at any time, for minister's salary or church expenses, or any repairs upon the property."

That at the time of the delivery of the said deed the said George R. MacKenzie addressed a letter to the said Trustees of the Scotch Presbyterian Church of Jersey City, in which he laid special emphasis upon the condition relating to the continuance of the name, the *Scotch* Presbyterian Church, and the condition relating to the non-use of instrumental music in worship; that on the delivery of the said deed, about the 22d day of May, A. D. 1885, the said The Trustees of the Scotch Presbyterian Church of Jersey City entered into possession of the said church and lands, and observed the conditions or terms of the said deed; that by a deed of the 11th day of May, A. D. 1887 (afterwards delivered, acknowledged and recorded), the said George R. MacKenzie and Rebecca, his wife, bargained and sold and conveyed unto the said Trustees of the Scotch 'Presbyterian Church of Jersey City, and their successors and assigns, with covenants for title, a certain parcel of land situate on the northerly side of Mercer street, Jersey City, New Jersey, distinguished as lot 25 in block 65 on the map of the farm of Cornelius Van Vorst, deceased, *habendum et tenendum,* to them and their successors and assigns, as above set forth, and

"on further condition that the same shall be maintained and occupied by the party of the second part as a manse or dwelling for its minister, or pastor;"

that the said George R. MacKenzie died on or about the 6th day of January, A. D. 1892, leaving a will (afterwards proved in Sullivan county, New York), whereby he gave a part of his estate to his executors upon certain trusts, not yet fully

performed, and the residue of his estate to the parties complainant; that the said Trustees of the Scotch Presbyterian Church of Jersey City used the last-mentioned parcel of land, as and for a manse, until the early part of the year A. D. 1900, when they ceased to use either the church or the manse, and by deeds of bargain and sale of the 26th day of April, A. D. 1900, conveyed to The Trustees of the Presbytery of Jersey City (a body corporate, and their successors and assigns, in fee, the church and three lots of land, and the manse and lot of land as above described; that on the 28th day of November, A. D. 1900, the said The Trustees of the Presbytery of Jersey City entered into a contract, in writing, with the Trustees of the Evangelical Lutheran Church of the Holy Trinity of Jersey City (a corporation under the Religious Societies Act), for the sale to them, in fee-simple, of the said church, manse, lands and tenements, at or for the price of $23,000; that when the parties complainant first learned of the making of the two deeds of bargain and sale lastly mentioned, and of the said executory contract for sale, they inquired as to the proposed use of the proceeds, and learned that it was the intention of The Trustees of the Presbytery of Jersey City not to recognize the conditions of the two deeds made by the said George R. MacKenzie, but to use the proceeds for the benefit of churches connected with the Presbytery of Jersey City, in which instrumental music is used in public worship, and that the parties complainant protested against such use of the proceeds as distinctly prohibited by the conditions of the two deeds made by the said George R. MacKenzie; that on the 4th day of February, A. D. 1901, the said The Trustees of the Presbytery of Jersey City (see *post*) adopted certain resolutions, to wit:

"*Resolved*, That the fund realized by the sale of the property of the late Scotch Presbyterian Church of Jersey City shall be applied—*first*, to the payment of the entire bonded and floating indebtedness of the Second Presbyterian Church of Jersey City, to an amount not exceeding $9,200, and the remainder to the reduction of the debts of the Westminster and Claremont Presbyterian churches of the same place, in proportion to their amount, *i. e.*, to the Westminster church the sum of $10,553.40, more or less, and to the Claremont church the sum of $1,746.60, more or less. * * *

"*Resolved, also,* That these several churches shall give bond to 'The Trustees of the Presbytery of Jersey City,' payable upon demand, but without interest, secured by mortgage upon their church property, for the amount of the respective sums received.

"*Resolved, also,* That this disposition of the fund is made with the conviction that the most necessitous Presbyterian work in Jersey City is now, and for the future will be, in the down-town section, and that Presbytery would impress upon the Westminster and Claremont churches the moral duty, consistently with their ability, to assist in sustaining the Second Church in coming years, if in the judgment of Presbytery it shall be necessary;"

that the churches referred to in the resolutions of the presbytery are Presbyterian churches in which worship is conducted, not as prescribed in the conditions of the two deeds made by the said George R. MacKenzie, but with the use of instrumental music, and that the expressed purpose of the presbytery, to use the proceeds of the said lands in the payment of the debts of those churches is in defiance of the conditions of the said deeds; that the act of the said George R. MacKenzie in making the conveyance of the said lands to the said Trustees of the Scotch Presbyterian Church of Jersey City was the creation of a charitable use by gift, and that he had a right to impose such conditions on the gift as he deemed proper, and to provide against a diversion of the estate from the use created; and that the said George R. MacKenzie had, in his lifetime, a standing in court to restrain such diversion, and that the parties complainant have such a standing since his death. The prayer of the bill was that The Trustees of the Presbytery of Jersey City might be restrained, by decree, from making use of the proceeds of the sale to the Trustees of the Evangelical Lutheran Church of the Holy Trinity of Jersey City, of the property conveyed by the said George R. MacKenzie and his wife to the Trustees of the Scotch Presbyterian Church of Jersey City in the payment of the debts of the Second Presbyterian Church of Jersey City and the Westminster and Claremont churches of Jersey City, and might be restrained from, in any other way, diverting such proceeds from the uses to which they were limited in the conditions of the said deeds made by the said George R. MacKenzie, and for general relief. Process of subpoena and injunction were also prayed in the usual form.

The answer of The Trustees of the Presbytery of Jersey City (a body corporate) set forth the events which led up to the two deeds of bargain and sale made by the Trustees of the Scotch Presbyterian Church of Jersey City to The Trustees of the Presbytery of Jersey City in particular—a communication addressed by or on behalf of the congregation of the Scotch church to the trustees of the presbytery in these terms:

"At the congregational meeting of the Scotch Presbyterian Church of Jersey City, held on January 31st, A. D. 1900, it was voted to convey to the Presbytery of Jersey City our church property, consisting of the church and manse on Mercer street, and this action has been further ratified by a unanimous vote at a second congregational meeting called especially for that purpose. The necessary deeds have been prepared and the transfer will be completed as soon as you have authority to receive them. * * * In making this transfer, we must inform you that there are certain conditions upon which the Scotch Presbyterian Church holds the property, restricting us in the manner of our use of it. In turning the property over to the Presbytery of Jersey City, we are acting in exact accord with these conditions, the deeds under which we hold stating that, should the church fail to comply with the conditions, the property is to be vested in the Presbytery. We have aimed faithfully to live up to the conditions, as we have understood them, but at present our existence as a church seems to be in the balance, and we request the Presbytery through you, its trustees, to accept the property;"

also the incorporation of the Trustees of the Evangelical Lutheran Church of the Holy Trinity of Jersey City under the Religious Societies Act, the character of the congregation of said church, as one holding Calvinistic doctrines, in form and substance the same as those held by the Presbyterian Church in the United States of America, with which the Scotch Presbyterian Church was connected, and the contract of sale entered into between the party defendant and the trustees of the Holy Trinity Church; also the adoption of the resolutions of February 4th, A. D. 1901, not by the party defendant but by the Presbytery of Jersey City, an ecclesiastical body in connection with the Presbyterian Church in the United States of America, and the intention of the party defendant, upon receipt of the purchase-money of the said church, manse, lands and tenements, to dispose of the same in accordance with the directions

42

of the Presbytery of Jersey City, denying, nevertheless, an intent not to recognize the conditions of the two deeds made by the said George R. MacKenzie, yet admitting that the three churches mentioned in the resolutions of the presbytery were churches which have heretofore used instrumental music in their worship. The answer denied that the parties complainant had any right or standing in court entitling them to prosecute their suit; that the parties complainant were entitled to relief by injunction or otherwise; and that the purposed use of the proceeds of the Scotch Church was unlawful or à breach of any trust. The answer substantially admitted the other *allegata* of the bill.

The cause came on for a hearing upon the bill and answer and the proofs (which were chiefly documentary exhibits) before Vice-Chancellor Pitney, who, being of opinion that the parties complainant have a standing in court as the children and heirs-at-law of the said George R. MacKenzie, deceased, and that the use proposed to be made of the fund obtained from the sale of the Scotch Presbyterian Church of Jersey City would be a breach of the limitations imposed upon said fund by the donor thereof, and that such use should be restrained, advised a decree almost exactly in the language of the prayer for relief. From the final decree, pronounced upon such advice and from the whole thereof, this appeal is taken.

*Mr. William H. Corbin,* for the appellants.

1. The so-called conditions in the two deeds made by Mac-Kenzie to the Scotch Church are really the declarations of the trust upon which the property is held.

2. The proposed use by the presbytery of the proceeds of the property will not be a diversion from the trusts declared. On the contrary, it is proper, whether considered with reference to the donor's general intent or the doctrine of *cy pres*.

3. The respondents have no standing in court to prosecute their suit. They have no reversion; they are not beneficiaries; they have no visitatorial powers.

*Mr. Charles D. Thompson,* for the respondents.

1. The respondents are entitled to prosecute their suit, either because they have rights and powers of visitation, or because the estate might revert to them in the future.

2. The intended application of the proceeds of the property is a diversion of the property, and is not authorized by the donor's intention or by the doctrine of *cy pres,* if such doctrine obtains in this state.

The opinion of the court (the foregoing statement of the case being made) was delivered by

GREEN, J.

1. Words seemingly appropriate to a condition only may introduce a covenant, a condition or a declaration of trust, and the whole of the clause submitted to investigation must, in form and scope, be considered, in order to determine within which class it should fall.

"Provided always," which Blackstone, in his *Commentaries, Book 2,* \*299, mentions as typical words of condition, may, either alone or with other words, be found introducing reciprocal covenants in agreements, as in *1 Bythe. Conv. (Jarman's ed.) 90, 93, 97, 101, &c.;* or conditions of re-entry in leases, as in *4 Bythe. Conv. 358, 422, 434;* or of defeasance in mortgages, as in *5 Bythe. Conv. 238, 247, &c.;* or declarations of trust or powers affecting trusts, as in *9 Bythe. Conv. 129, 141, 205, &c.* The words employed by the draughtsman of the deeds of conveyance under examination are "on condition," "on further condition," and although these also are words appropriate to conditions in deed (*Litt. Ten.* § 238), there are not wanting in our own reports illustrations of a wider use. Thus, in *Woodruff* v. *Woodruff, 44 N. J. Eq. (17 Stew.) 349, 350, 353, 354 (1888),* the complainant's deed contained these words:

"Provided, nevertheless, and upon the following condition, that if the said grantor, A. D. W., shall survive the said grantee, P. H. W., he, the said grantor, shall have the right, within eighteen months after the death of the said grantee, to purchase back again all the right, title and interest

in said farm 'Oaklands,' hereby conveyed, at a valuation to be then made by two disinterested persons, one of whom shall be selected by the legal representatives of the said grantee, and the other selected by said grantor, and in case of a disagreement the persons so selected may choose a third person."

This was held to be a covenant, the court stating the guiding principle of construction, and citing *2 Pars. Cont.* *511, and *4 Kent. Com.* *132. In *Woodruff* v. *Trenton Water Power Co.,* *10 N. J. Eq.* (2 Stock.) 489, 492, 507, 508 (1856), the deed under consideration contained this clause:

"Subject, nevertheless, to the proviso, that if the said main raceway shall not be made on the said premises in conformity to the act incorporating said company the said lands and premises shall revert to the said G. W., his heirs and assigns; and also that," &c.

The chancellor concluded that this clause was a condition, saying: "There are no covenants in this deed on the part of the grantees. * * * The language in the deed is appropriate to create a condition, and, as if to avoid any doubt, the legal consequences of a breach or violation of the condition is inserted;" and he cited *Bouv. Dict., Tit. Proviso; Co. Litt.* *216.* Thereupon he held that equity would not enforce the specific performance of a clause in a deed, the non-performance of which would work a forfeiture of the estate. On appeal, the decree was unanimously affirmed in this court, without an opinion. In *Mills* v. *Davison,* 54 N. J. Eq. (9 Dick.) 659, 662, 664, 665 (1896), the deed of gift embraced this clause:

"With this express condition and limitation that neither the said party of the second part, nor their successors, shall at any time sell, mortgage or in any way convey the said land and premises, or any part thereof, and that no building shall be kept, maintained or erected thereon except for the purpose of public worship and teaching in accordance with the usages, rites and ceremonies of the Protestant Episcopal Church in the United States of America, and also except the proper outbuildings appurtenant thereto."

This court, reversing *Mutual Benefit Life Insurance Co.* v. *Grace Church,* 53 N. J. Eq. (8 Dick.) 413, decided that the clause created a trust, not a condition, saying, by Justice Depue,

"such a construction [*i. e.,* as a condition designed to defeat the estate granted] is, it seems to me, contrary to the intent of the grantor in making the gift.  *  *  *  Words of express condition are not inapt as introductory to a declaration of trust." Numerous authorities were cited, among them, *3 Com. Dig., Tit. Condition "T;" Tys. Char. Beq. 508; Tud. Char. Trusts 50.* In all of our decisions it will be observed that the whole clause in the instrument of conveyance was considered—the introductory words, the words setting forth the thing to be done or omitted, and the words of determination or reverter, if any. To the same effect are *Sohier* v. *Trinity Church, 109 Mass. 1 (1871),* and *Episcopal City Mission* v. *Appleton, 117 Mass. 326 (1875),* where the question arose upon clauses in deeds; *Goodman* v. *Mayor of Saltash, 7 App. Cas. 633 (1882),* where it arose upon a presumed grant; and *Stanley* v. *Colt, 72 U. S. 119 (1866),* and *Attorney-General* v. *The Wax Chandler's Co., L. R. 6 Eng. & Ir. App. 1 (1873),* where the question arose upon devises.

2. All of the words used in the clause in question being considered, and the absence of words of determination or reverter being noted, the intent of the parties, to be exercised as permitted by the principles of law, will be best subserved by holding the clause to be a declaration of trust.

Examining the deeds in the light of the authorities, we find no words whereby either party binds itself to the other for the doing or not doing of a particular thing, or for the existence or non-existence of a particular state of facts, and for breach whereof the party bound should be answerable in damages, hence we have no difficulty in concluding that the words are not words of covenant. See *Bouv. Dict., Tit. Covenant; 3 Blacks. Com. *156; Woodruff* v. *Trenton Water Power Co., 10 N. J. Eq. (2 Stock.),* at *p. 508.*

Re-examining the deeds, we find no words of forfeiture of the estate given, or conferring a right of re-entry as for condition broken. These words are commonly found in well-drawn conditions. See *Litt. Ten.* § 331; *Woodruff* v. *Trenton Water Power Co., supra; Southard* v. *Central Railroad Co., 26 N. J. Law (2 Dutch.) 13 (1856); McKelway* v. *Seymour, 29 N. J. Law*

(*5 Dutch.*) *321* (*1862*). Nevertheless, as such words are not essential to conditions upon conveyances of estates of freehold, except conditions in form *si contingat* (*Litt. Ten.* §§ *330, 331*), we do well to look more deeply. If, then, we would regard the clauses as conditions, it must be as conditions subsequent; and such conditions are with us not favored, even at law, and are construed strictly because they tend to destroy estates (see *Den* v. *Lawrence Church, 20 N. J. Law* (*Spenc.*) *551, 555* (*1845*) ; much less are they favored in equity. In *Grigg* v. *Landis, 21 N. J. Eq.* (*6 C. E. Gr.*) *494, 501, 502, 511, 512* (*1870*), where the assignee of a vendee had performed the stipulations for improvements, but not within the time prescribed, this court decreed specific performance at the prayer of the vendee's assignee, saying that penalties, forfeitures and re-entries for conditions broken are not favored in equity, and give rise to a large branch of equitable relief ; that usually they are held to be securities for the payment of money and the performance of conditions, and when compensation can be made for non-payment or non-performance, equity will relieve against the rigid enforcement of the contract. In *Morris* v. *Kettle, 56 N. J. Eq.* (*11 Dick.*) *826, 831* (*1898*), this court approved the language of Chancellor Kent, that "it may be laid down as a fundamental doctrine of the court that equity does not assist the recovery of a penalty or a forfeiture, or anything in the nature of a forfeiture." In *Bird* v. *Hawkins, 58 N. J. Eq.* (*13 Dick.*) *229, 230, 243* (*1899*), there was annexed to a devise a proviso or condition that "she [the devisee] shall, within five years of my decease, free said properties from all indebtedness and mortgages that may be against them at the time of my death." The court said : "These are the essential elements of an estate upon condition subsequent. But that the devise is of this character, and that the devisee has failed to perform the conditions, will not lead this court to declare and enforce a forfeiture. * * * If the devise be upon terms which are capable of being enforced in equity, and the devise has been accepted, equity will compel compliance with the conditions annexed. * * * If this be inequitable or impossible, equity will award compensation in damages for breach of the condition, if that be possible."

Hence, although we do not forget that it was said, in *Grigg* v. *Landis, supra* (at *p. 502*), that "it is not to be supposed that a court of equity will lightly dispense with a contract made between competent parties," we are but following the uniform leanings of courts of equity in not holding the clauses under consideration to be conditions subsequent, because of the harsh consequences which would legally flow from such a construction, unless they could be mitigated by the application of equitable rules.

There remains, then, only the conclusion that the deeds embody and declare limitations in trust. To such conclusion, we are pointed by Tyssen, in his work on *Charitable Bequests* (*p. 508*), in these words:

"A trust may be raised by a gift upon condition of doing a certain thing, even when followed by a gift-over, if the condition be broken. * * * The tendency in early times was to treat such a limitation as a conditional gift; the tendency in modern times is to treat it as a trust."

To such conclusion we are led by our own decision, in *Mills* v. *Davison, supra,* and in such conclusion we are strengthened by the cases which Justice Depue, in *Mills* v. *Davison* (at *p. 665*), has so skillfully arrayed. The lawful intent of the parties to the original conveyances will thereby be most fully subserved.

3. The trust thus declared is evidently one for the public worship and instruction of an indefinite number of persons according to Presbyterian faith and polity. Nevertheless, there are other provisions which we do not overlook, but whether they be essential or accidental we do not now determine.

It is obvious, however, that one sufficiently interested in religious things to become the donor of a church, manse and lands, would wish to make the donation of the most lasting value, and, to such end, would do all that in his judgment could secure the prosperity of the church on its material side, draw men within the reach of its worship and work on the spiritual side, and promote the purity and power of its worship and instruction. To such end were framed those provisions of the trust which have respect to the repairs of the church and manse, the avoidance of liens thereupon, the name of the congregation and the pro-

hibition of instrumental music. The purposes of such provisions are manifest in the declaratory clauses contained in the deeds of conveyance, and additional light is thrown upon them by the letter of the donor, dated May 22d, 1885. This letter was written and signed by the grantor named in the deeds, was addressed to his grantees, was delivered at the same time with the earlier deed, and does not alter, vary or contradict the terms of the sealed assurances; we are therefore permitted to consider it. See *1 Perry Trusts (5th ed.)* §§ *77, 147; 1 Greenl. Evid. (15th ed.)* § *266; Lew. Trusts (7th Eng. ed.) 47, 48, 51, 52.* It is true that the Presbytery of Jersey City, to whose jurisdiction and care the congregation worshiping in the church given was to be subject, does not, as an ecclesiastical body, appear to have shared the views of the donor respecting the use of instrumental music in worship. Yet we are in nowise informed that this ecclesiastical body does or did hold the use of instruments to be essential to worship; and it may well have been that the donor believed that subjection to presbyterial polity, as distinguished from congregational or prelatical polity, was the thing of prime importance, and that other points might be sufficiently secured by the provisions of the deeds of donation. Not of whim or caprice, but to promote peace and purity, as he believed (*3 Schaff–Herzog Encycl. Relig. Knowl. 1894, 1903*), did the donor frame these limitations in trust, and his right to do so must be allowed, unless they contravene some principle of law. See *Lew. Trusts (7th Eng. ed.) 485; Attorney-General* v. *Pearson, 3 Meriv. 353, 409, 410.*

The trusts limited and declared in the two deeds under consideration are good as charitable trusts.

It was said, in *Norris* v. *Thomson's Executors, 19 N. J. Eq. (4 C. E. Gr.) 307, 312 (1868),* that the statute of charitable uses (*43 Eliz. c. 4*) is not in force in this state, and the remark has been perhaps too freely quoted; nevertheless, its accuracy is, for the present, of but little concern. This court, in the same case on appeal (*Thomson's Executors* v. *Norris, 20 N. J. Eq. (5 C. E. Gr.) 489, 522) (1869),* speaking by Chief-Justice Beasley, said: "I do not understand that there is any difference whatever between the common law of England and the law of

this state as to what constitutes the legal definition of a charity. And, by this common law, I mean the system, so far as respects this question, which has grown up in a series of decisions founded, in part, upon *43 Elizabeth c. 4*—the statute of charitable uses. The doctrine of the English court of chancery, with regard to the mere classification of things which are and those which are not charities, has been very generally recognized in this country."

Lewin, writing of trusts generally (*Lew. Trusts (7th Eng. ed.) 20*), says:

"Public trusts and charitable trusts may be considered, generally, as synonymous expressions. * * * A public or charitable trust has for its objects the members of an uncertain and fluctuating body, and the trust itself is of a permanent and indefinite character."

Tudor, writing of charitable trusts especially (*Tud. Char. Trusts (2d Eng. ed.) 5–15*), says of gifts within the statute of Elizabeth, or by analogy within its spirit or intendment, that they are gifts for the benefit of the poor, gifts for the advancement of learning, gifts for the advancement of religion, gifts for public and general purposes. Tyssen, writing of Charitable Bequests (*Tys. Char. Beq. 5, 6*), speaks to the same effect, adding that many purposes have been held to be charitable which are not mentioned in the statutory list.

In *Jackson* v. *Phillips et al., 96 Mass. 539, 566 (1867)*, Justice Gray says: "A charity, in its legal sense, may be more fully defined as a gift, to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint; by assisting them to establish themselves in life; or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it be so described as to show that it is charitable in its nature." Of this definition Mr. Perry, in his work on *Trusts (5th ed.) § 697*, has said that it leaves nothing to be desired; and the editors of *5 Am. & Eng. Encycl. L. (2d ed.) 894*, and of *6*

*Cyc. L. & P. 900,* have accepted it as comprehensive and satisfactory. The decisions of the courts of Massachusetts and New Jersey are not always at one in cases of charities; but, for present purposes, we may give hearty assent to Justice Gray's definition.

Measured by the definitions, English and American, the clauses of the two deeds under consideration create valid charities, but we are not left to generalities only. In *Baldwin's Executor* v. *Baldwin, 7 N. J. Eq. (3 Halst.) 211, 213 (1848),* there was a devise of land, in trust, as the site of a building for a free school for the benefit of poor children, and a lecture-room for religious worship, and as the site for a dwelling-house to be occupied by the minister that might from time to time officiate in said room, the said lecture-room to be for the use of the denomination of Christians called Methodist Episcopal; and it was held to be a good charitable devise. In *Trustees of Cory Universalist Society* v. *Beatty, 28 N. J. Eq. (1 Stew.) 570, 572, 575 (1877),* there was a bequest of $12,000 to certain trustees, after they should have established a society of the denomination of Universalists, to be used "to employ a preacher of the above-named denomination," and it was held to be a legal charity. In *De Camp* v. *Dobbins, 31 N. J. Eq. (3 Stew.) 671, 672, 688, 696 (1879),* there was a devise to the North Reformed Church of Newark, "in trust that they may use the same to promote the religious interests of the said church and to aid the missionary, educational and benevolent enterprises to which the said church is in the habit of contributing." The second question considered in this court was whether this testamentary provision created a valid charitable use, and it was answered affirmatively. In *Mills* v. *Davison, supra,* there was a gift by deed to the rector, wardens and vestrymen of Grace Church, Westfield, incorporated by certificate pursuant to the Religious Societies Act, upon the "express condition and limitation" above set forth, and this court held that there was a valid charitable trust for public worship and teaching in conformity with the rites and ceremonies of the Protestant Episcopal Church. Under the doctrine of these cases, and the operation of the Religious Societies Act, as expounded in *Morgan* v. *Rose, 22 N. J. Eq. (7 C. E. Gr.)*

*583, 585 (1871)*, and *De Camp* v. *Dobbins, 31 N. J. Eq. (4 Stew.) 671, 693, 694 (1879)*, we will have no difficulty in holding the trusts limited in the deeds to be lawful charities in their primary aspects.

There are, however, trusts declared, which are to be executed by the Presbytery of Jersey City for similar charitable purposes, on failure of the primary trusts for the benefit of the Scotch Presbyterian Church; and, as under the circumstances of the case, these secondary limitations have come into play, they demand some further notice.

In the original deeds, we read:

"If the above conditions are not complied with on the part of the party of the second part hereto, the Trustees of the Scotch Presbyterian Church, the said premises are to vest in the Presbytery of Jersey City, and its legitimate Presbyterian successors, for Presbyterian religious purposes, upon the same conditions aforesaid."

Here we have new or substituted trustees and secondary or shifting trusts.

The notion of a new or substituted trustee is well established in this state. The Trustees of the Presbytery of Jersey City were incorporated under a statute which gave power to take and hold the church, manse and lands (*3 Gen. Stat. p. 2759 §§ 120–124*); and the legal estate in the church, manse and lands was vested in the last-mentioned trustees by the two deeds of bargain and sale of the 26th day of April, A. D. 1900. Proper trustees and a legal estate in them are then easily found; the validity of the equitable estate or interest alone requires any discussion.

Whether uses were essentially the same as the *fidei commissa* of the civilians, and when and how they were introduced into England and recognized by the common law, are questions which need not delay us. The curious may read the *Inst. of Justinian Lib. 2 tit. 23; Corn. Uses \*10, \*14; Sand. Uses \*3, \*6; 2 Washb. Real Prop. (5th ed.) 412–416.*

Suffice it to say that perhaps before, certainly soon after the enactment of the statute of uses (*27 Hen. VIII. c. 10*), three forms of future use became known to the law. These were— *firstly*, contingent uses, taking effect by way of remainder (*2*

*Cruise Dig. (Greenl. ed.) *267; 2 Washb. Real Prop. (5th ed.) 659*); *secondly,* springing uses, limited to arise without any preceding limitation (*Corn. Uses *91; 2 Cruise Dig. *263; Lew. Perp. *57; 2 Washb. Real Prop. 665*); and *thirdly,* shifting or secondary uses, to arise in derogation of another use, limited in the meantime (*Corn. Uses *91; 2 Cruise Dig. *264; Lew. Perp. *58; 2 Washb. Real Prop. 669*). By a future use, of the third form at least, a fee might be limited after a fee. *Corn. Uses *19, *92; 2 Cruise Dig. *264; 5 Cruise Dig. *345; Lew. Perp. *58; 1 Washb. Real Prop. 93; 2 Washb. Real Prop. 27, 28, 29.*

These springing and shifting uses were indestructible by any act or assurance of the owner of the previous freehold (*Lew. Perp. *123–*128*), and were inalienable by any act *inter vivos* of the person in whose favor they were themselves limited (*Corn. Uses *100*), either because the law regarded them as possibilities only (*Chal. Real Prop. *57, *58, *141, *142, *143*), or because, as Gray states it (*Gray Perp.* § 114), they were not vested. Through such qualities these executory interests tended to become serious clogs upon the free transmission of real property, and to hinder this tendency some measure of restraint was sought. This restraint was at length effected through the rule against perpetuities (see *Lew. Perp. *130; Chal. Real Prop. *145*); effected was it, at least, through that form of the rule which might be styled the "Rule Against Remoteness" (*Gray Perp.* § 140). That the rule has had, historically, an aspect or form adverse to present indestructible and inalienable interests, and another adverse to interests indestructible and inalienable because they would not vest until a remote period, seems clear from the definitions collected in *Bouv. Dict., Tit. Perpetuity,* and *1 Perry Trusts (5th ed.)* § 377; and that both forms of the rule have, rightly or wrongly, found a lodgment in our jurisprudence, at least as to personalty, also seems clear from a perusal of *Hartson* v. *Elden, 50 N. J. Eq.* (*5 Dick.*) 522 (*1892*), and *Stout* v. *Stout, 44 N. J. Eq.* (*17 Stew.*) 479 (*1888*).

Here we should recollect that uses, modified and developed under the influence of the statute *27 Hen. VIII. c. 10* (*Chal. Real Prop. *310*) became the parent of the modern trusts (*Corn. Uses *27; Lew. Trusts (7th Eng. ed.) 6*); or, as it is some-

times put, trusts of real estate are uses not executed by the statute. *1 Cruise Dig.* (*Greenl. ed.*) \*381; *2 Washb. Real Prop.* (*5th ed.*) *488; 1 Perry Trusts* (*5th ed.*) § *300.* Hence we should expect that the very same contingent, springing and shifting interests, which first arose in uses, would be found among the later trusts; and so, indeed, it was. *Lew. Perp. ch. 8; Lew. Trusts* (*7th ed.*) *76; 2 Washb. Real Prop.* (*5th ed.*) *534.* Precisely the same evils, too, were perceived in them as trusts, which had been perceived in them as uses, and precisely the same rule was invoked to restrain them. *Lew. Perp.* \*138, \*139, \*140; *Chal. Real Prop.* \*149; *Lew. Trusts 81, 89.*

But whether they be uses or trusts, it is now a pertinent observation that charitable gifts are not obnoxious to or are outside of the rule against perpetuities; so, notwithstanding an occasional doubt, such as may be found in *Chal. Real Prop.* (at *p.* \*157*), hold many authoritative text-writers. See *Perry Trusts* (*5th ed.*) §§ *384, 736; 3 Pom. Eq. Jur.* (*3d ed.*) §§ *1018, 1026; Tud. Char. Trusts* (*2d ed.*) *8, 251; Tud. Char. Trusts* (*3d ed.*) *56; Tys. Char. Beq.* *427; 4 Kent Com.* (*14th ed.*) \*283, note. This freedom of charities from the general rule may not be true if the gift be conditional upon an event to happen at a time too remote. See *Tud. Char. Trusts* (*3d ed.*) *56; Tys. Char. Beq.* *425, 426, 427.* Nevertheless, it would seem that this court has determined, without noting any exception, that the rule against perpetuities does not apply to charitable gifts. *Mills* v. *Davison, supra* (at *p. 662*).

The principle thus enunciated is illustrated in a decided case of remarkable appositeness. This case is *Christ's Hospital* v. *Grainger, 1 Macn. & G. 460, 464* (*1849*), affirming the vice-chancellor of England (*16 Sim. 83, 101*). In this case there was a gift by will (A. D. 1624) to the corporation of Reading, for the benefit of the poor of that town, with a direction that if the donees should neglect to perform the will for one year, the gift should go over to the corporation of London for the benefit of Christ's Hospital. In A. D. 1848, more than two centuries after the creation of the trust, and more than twenty years after a violation of the proviso, the corporation of London instituted a suit in equity, on behalf of the hospital, claiming the property in ques-

tion, and succeeded therein, Lord-Chancellor Cottenham holding that the contingent limitation over from one charity to another was not within the principle of the rule against perpetuities. This decision has been approved by Tudor, Tyssen and Perry, among the text-writers, although questioned by Gray, and it has been followed and approved in England (*In re Tyler, L. R. 3 Ch. 252 (1891)*); cited as authority in Massachusetts, in *Odell* v. *Odell, 92 Mass. 1 (1865)*, and followed and approved in *Jones* v. *Habersham, 107 U. S. 174, 185 (1882)*. We may conclude, therefore, that the trusts declared in the original deeds of gift were valid charities in their secondary as well as in their primary limitations.

4. It being established that the trusts are good as charities, it should follow that they are enforceable in this state.

For breaches of trust, generally, there are remedies, usually administered in equity, according to the nature of the breach or violation. That such wrongs are objects of judicial notice, and are appropriately redressed, a mere glance at the index of any treatise on the law of trusts suffices to show. We are not now, however, so much concerned with breaches of trusts, generally, as with breaches of charitable trusts. With respect to such, equity gives appropriate remedies, which usually fall under one of three different classes: (*a*) the following of the trust estate into the hands of one to whom it has been wrongfully conveyed; (*b*) the following of the property into which the trust estate has been converted; (*c*) a proceeding against the trustees. See *Tud. Char. Trusts (2d ed.) 329; Tud. Char. Trusts (3d ed.) 288*. The breach or violation alleged in the case in hand does not require a remedy within the first class, inasmuch as a sale of the church, manse and land was, or may have been, within both the primary and secondary limitations in trust; but it may require a remedy savoring of both the second and third classes. Here, again, the nature and extent of the redress will be controlled by the *allegata et probata* in the cause. For the present, all that can be said upon the general allegations is that equity will restrain, by injunction, breaches that are shown to be in contemplation (see *Tud. Char. Trusts (2d ed.) 365, 366, 381; Tud. Char. Trusts (3d ed.) 300; Attorney-General* v. *Welsh, 4 Hare*

*572* (*1844*) ; see, also, *Lew. Trusts* (*7th ed.*) *726*) ; that it will give direction for future administration of the trusts (see *Tud. Char. Trusts* (*2d ed.*) *344; Tud. Char. Trusts* (*3d ed.*) *299; Attorney-General* v. *Aspinall, 2 Myl. & C. 613, 618* (*1837*), and that it will, if it be at all possible, preserve and enforce with exactness the trusts originally declared. See *Tud. Char. Trusts* (*2d ed.*) *243, 247; Tud. Char. Trusts* (*3d ed.*) *245–249; Attorney-General* v. *Pearson, 3 Meriv. 353, 400, 418, 419* (*1817*) ; *Craigdallie* v. *Aikman, 1 Dow P. C. 1* (*1813*) ; *S. C., 2 Bligh 529* (*1820*) ; see, also, *Lew. Trusts* (*7th ed.*) *485, 486; Mormon Church* v. *United States, 136 U. S. 1, 51* (*1889*) *arguendo.*

It is, however, urged that, through lapse of time and changed conditions, not brought about by the Trustees of the Scotch Presbyterian Church, or by The Trustees of the Presbytery of Jersey City, an exact compliance with the terms of the original trust is now, in the use of the proceeds of the trust estate, impracticable, if not impossible, and that the use of the proceeds which the presbytery's resolutions propose is the best approximate use, all things considered. As a consequence of this statement, the applicability of the doctrine of *cy pres* has been discussed, *pro* and *con.*

Before considering the merits of this discussion, two remarks may be proper. The first of these is, that no inquiry has been made, under the direction of the court below, into the nature and particulars of the trust estate, the past management thereof, the alterations (if any) which should take place in the administering of the charity, and the proper objects of the charity under the changed conditions, and no scheme for the future administration of the charity has been submitted to or approved by the court. Such an inquiry, in whole or in part, and such a scheme, are usual, and may be indispensable. *Seton Dec.* (*Heard's ed.*) *284, 288; Story Eq. Jur.* (*13th ed.*) § *1190,* at end. In the absence of any scheme judicially approved, the trustees of a charity may not make a *cy pres* application of the estate on their own authority, even though it be desirable. *Tud. Char. Trusts* (*3d ed.*) *245; In re Campden Charities, 18 Ch. Div. 310, 328, 329* (*1881*). The second remark is that, largely through the absence of any inquiry, this court is in the

situation of Lord Eldon, in *Davis* v. *Jenkins, 3 Ves. & B. 151, 159 (1814)*—the pleadings do not disclose enough to enable this court to determine whether the trusts originally declared may not be performed with exactness. If they by any means can be so performed, there is no room for the doctrine of *cy pres*. *Pease* v. *Pattinson, 32 Ch. Div. 154, 161 (1886)*.

Nevertheless, as the question has been fully argued and it is our wish, if it may be done, to spare the parties the delay and expense of a further appeal, we briefly inquire into the nature of the doctrine of *cy pres* and the place thereof in our jurisprudence.

*Cy pres* is translated by Kelham (*Norm. Fr. Dict.*) "as near as may be." The doctrine of *cy pres* is therefore the doctrine of nearness or approximation, and it appears in English jurisprudence in three separate departments, yet with similar operation and effect. Firstly, in the law of testaments, where a personal legacy has been given upon a condition precedent, and the literal performance of this condition has become impossible from unavoidable circumstances and without fault of the person to be benefited. Here, it is sufficient if the condition be performed as nearly as it can be. See *1 Story Eq. Jur.* (*13th ed.*) § *290; Whart. Lex., Tit. Cy pres; 1 Rop. Leg.* (*While's ed.*) *\*755–\*758; Theob. Wills* (*6th ed.*) *547–550*. Secondly, in the law of private trusts, where lands are limited to an unborn person for life, with remainder to his first and other sons, successively, in tail. Here, in order to secure the flowing of the testator's bounty to the issue, the limitations may be held to create an estate in tail in the first taker. See *10 Bythe. Conv.* (*Jarman's ed.*) *62, 63; Wharl. Lex., supra; Nicholl* v. *Nicholl, 2 W. Bl. 1159*. Thirdly, in the law of charitable trusts, where gifts have been made for charitable purposes which, either originally or in the course of time, cannot be literally executed. Here the gift will be administered, as nearly as may be, according to the donor's purpose, under general rules of law. *2 Story Eq. Jur.* (*13th ed.*) § *1169; Wharl. Lex., supra; 2 Encycl. L. of Eng. 470; Tud. Char. Trusts* (*2d ed.*) *259, 260; Tud. Char. Trusts* (*3d ed.*) *143, 144*. In all of these instances it is to be observed that the underlying principle is this: Where the testator

or donor had two objects in view—one primary or general, and the other secondary or particular—and these are, literally speaking, incompatible, the particular object must be sacrificed in order that effect may be given to the general object, according to law, and "as near as may be" to the testator's or donor's intention. Again, the principle may be more briefly stated as that of applying property, as nearly as possible, according to the donor's intentions, when those intentions cannot be exactly carried out. The facts of the case in hand being regarded—insufficiently as they may be before us in the pleadings and proofs—the following application of the principle may not be found inappropriate:

"Where the terms of a gift in trust for charitable purposes were originally precise and complete, but have, by lapse of time or otherwise, become unsuited, under the altered circumstances, to carry out the general intent of the founder, in such cases the court of chancery may regulate the funds of the charity by means of a scheme." *Tud. Char. Trusts (2d ed.) 260.*

The judicial doctrine of *cy pres,* thus defined and applied to charities, may have, we think, a proper place in the jurisprudence of this state. This conclusion we reach on grounds which are now to be pointed out.

(*a*) In the two cases in this court in which the doctrine of *cy pres* was laid to one side, the existence of the doctrine among us was in nowise denied. In *Thomson's Executors* v. *Norris, 20 N. J. Eq. (5 C. E. Gr.)* (at *p. 522*) (*1869*), it was said by Chief-Justice Beasley: "In England, a bequest for charity will be effectuated * * * whether the bequest can be carried into exact execution or not, for, when a literal execution becomes impracticable, the court will administer it on the doctrine of *cy pres.* * * * I am not aware that in our courts this subject has received any elucidation." In *Hesketh* v. *Murphy, 36 N. J. Eq. (9 Stew.)* (at *p. 310*) (*1882*), the same judge said: "It has been for ages the settled rule in the English law, and has been in this country often regarded as the true principle, that when a gift has been placed in the hands of a trustee to promote a charity, which, from the mutation of circumstances had become incapable of fulfillment, such gift was to be applied by the courts, exercising a

purely judicial authority, to some cognate object.     *     .*     *
The present case does not call for any opinion on the important
question how far, in the application of simply judicial standards,
the courts of this state would undertake to exercise the doctrine
of *cy pres* by construction."

(*b*) In the case last cited, this court has averred that very
extensive powers over charitable uses and trusts reside in the
equity courts of this state.     At *p. 306*, the chief-justice wrote:
"With the exception of this prerogative [one derived from the
king, as *parens patriæ*], I am not aware that the court of chan-
cery of this state is devoid of any power that has ever been
exerted by an English chancellor with respect to the construc-
tion, regulation and enforcement of devises or bequests to chari-
table uses." Again (at *p. 307*), he wrote: "It has been made
certain by modern research that the primitive and inherent
powers of a court of equity in this domain [cases of the misap-
propriation of charitable funds] are *sui generis* and of a very ex-
tensive character, and, whatever such original authority was, it
exists in full vigor in the hands of the chancellor of this state."

(*c*) If the doctrine of *cy pres* were a consequence of the
equitable jurisdiction over charities, existing in England and so
fully accepted in *Hesketh* v. *Murphy,* it is not to be rejected
because the statute of charitable uses is not of itself here in
force.     Modern investigation has shown that jurisdiction over
charities had an earlier and deeper foundation than the statute
of *43 Eliz. c. 4.*     See *Tud. Char. Trusts (2d ed.) 102, 103; Tud.
Char. Trusts (3d ed.) 88, 89, 93, 94; Tys. Char. Beq. 515–518;
2 Story Eq. Jur. (13th ed.) §§ 1154a–1154c, 1162; 3 Pom. Eq.
Jur. (3d ed.) § 1028.*     If, as seems far more likely, the doctrine
of *cy pres* had its origin in the civil law (*2 Story Eq. Jur.* §
*1169; 2 Domat (Str. ed.) §§ 3589–3590 1-2; Wilm. Opin. 33,
34; 1 Rop. Leg. *755–*758*), still more is the acceptance or
re-enactment of the statute of Elizabeth an unessential thing.

(*d*) The objection to the doctrine of *cy pres* because of the
excesses which have been committed in its name (for the most
part, when applied by the chancellor of England, acting under
the sign manual of the crown, rather than as a judge of a court
of equity) is no longer to be regarded as of weight.     Modern

decisions have pruned the judicial doctrine, so far as it may have needed pruning, and have confined it within sensible limits. The sound rule now is—at least in America—that courts will not execute charitable trusts in a manner different from that intended, unless the intent cannot in the original mode be literally carried out; that they will preserve the substance, although the mode be departed from, and that they will not presume or invent an intention which the testator or donor has not fairly indicated. See, in support of the doctrine as modified, *2 Story Eq. Jur.* (*13th ed.*) §§ *1169, 1176, 1182; 3 Pom. Eq. Jur.* (*3d ed.*) § *1027; Bisp. Pr. Eq.* (*7th ed.*) §§ *126–129; 6 Cyc. L. & P. 964, 965.*

(*e*) Mr. Bispham, in his treatise on *Equity Principles* (*7th ed.*) § *130*, observes that, in New Jersey, the doctrine of *cy pres* has not yet been approved, and then says: "There seems to be no valid reason why the judicial *cy pres* doctrine, as explained in *Jackson* v. *Phillips, 96 Mass. 574–594*, should not be approved in all those states wherein the statute of Elizabeth has been decided to be in force, or where its principles have been adopted by the law of the state." A perusal of this statute does not disclose any real inconsistency between the principles embodied in it and those which are commonly recognized among us, although the methods of procedure which it prescribes are quite foreign to ours. Mr. Pomeroy, in his work on *Equity Jurisprudence* (*3d ed.*) § *1029*, divides the states of the Union, with respect to charitable trusts, into three classes, to wit, those in which such trusts have been abrogated or not adopted; those in which such trusts exist in a modified and restricted form, and in which the doctrine of *cy pres* has been generally rejected; and those in which the law of charitable trusts has been accepted in its full extent, and in which the doctrine of *cy pres* is applied, although not so freely and under such extreme circumstances as in England; and he then says of this state that it might be properly placed in the third class, inasmuch as her courts uphold trusts very uncertain both as to trustee and object, although they do not profess to accept the English doctrine in all its fullness.

(*f*) Lastly, it can scarcely be denied that our courts have already accepted the *cy pres* doctrine in its essence, although

they have not labeled it with the name. In *Newark* v. *Stockton, Attorney-General, 44 N. J. Eq.* (*17 Stew.*) *179* (*1888*), this court had under consideration a statute affecting a parcel of land to which the city of Newark had an indefeasible title (*p. 185*) by virtue of an ancient deed from the proprietors, in trust, as a place of burial for the old settlers of Newark (*p. 180*). In 1886, the legislature had enacted that when lands are held by cities for burial purposes, and in the judgment of the common council the public good would be subserved by devoting such lands to other public uses, it should be lawful to use such lands for any public purpose for which, in the judgment of the common council, they were best adapted. The council of Newark was proceeding to convert the land in question into a public market place (*p. 185*), and, in the chancery, such action was enjoined. This court reversed the chancellor, and held that the nature of the uses and the enabling legislation being considered, the conversion might be carried out (see *pp. 186, 190*).

In *Pennington* v. *Metropolitan Museum of Art et al., 65 N. J. Eq.* (*20 Dick.*) *11* (*1903*), the present chancellor had before him a bill filed by the executors of Jacob S. Rogers for instructions respecting the administration of a trust of great value. Suffice it here to say that he dealt with the question (at *p. 22*) after this fashion: "If trustees disclose a situation of their trust in which a slavish adherence to the terms of the trust will operate wholly to prevent the benefits intended by its creator, and they seek instructions and directions as to their duty, I think that instructions and directions for a course of conduct which, though different from that prescribed by the terms of the trust, will actually carry out the intent of the creator, may well be grounded upon and sustained by the necessity of the case. The benefits intended for the beneficiaries are the main subjects of consideration. The modes in which those benefits may be attained are incidental, and necessity may require a change of mode in order to produce the intended effect." Whereupon the chancellor referred the cause to a master to consider and report a scheme for the management of the trust fund.

On the whole, we affirm that the judicial doctrine of *cy pres,* as pruned and restrained by modern authorities, English and

American, and as affected by our own decisions, has a proper place in our jurisprudence, and that, after a proper inquiry, it may, if necessary, be applied to the management of the estate or fund in question.

The trend of the argument in this court and our own reasoning having been directed to the probability that the charitable trusts under consideration may be enforced, exactly or approximately, it would be incongruous now to treat at length of the course to be pursued in case such trusts should fail or become wholly inoperative. We are not, however, to be understood as prejudging any rights hereafter to be set up under such circumstances.

5. The foregoing discussion does not, unfortunately, dispose of the case altogether. The inquiry yet remains, what is the standing of the complainants, and is their suit well conceived?

The complainants are in nowise alleged to have been or to be office bearers in the Scotch Presbyterian Church or in the Presbytery of Jersey City, whose rights as such have been infringed. If such were the case, and the rights were of such a nature as to be cognizable in the civil courts, they would, for the most part, find redress in the courts of law. See *State* v. *Crowell, 9 N. J. Law (4 Halst.) 390 (1828)*; *Miller* v. *English, 21 N. J. Law (1 Zab.) 317 (1848).* Neither is it alleged that they were or are members of the congregation of the Scotch Presbyterian Church or pew-holders therein, or members of any other congregation under the jurisdiction of the Presbytery of Jersey City, whereby they have or may have acquired rights in the property in question which would enable them, as *cestuis que trustent,* to call their trustees to account in equity. See *Whitecar* v. *Michenor, 37 N. J. Eq. (10 Stew.) 6, 7 (1883)*; *Everett* v. *First Presbyterian Church, 53 N. J. Eq. (8 Dick.) 500, 506 (1895)*; *Davis* v. *Jenkins, 3 Ves. & B. 151 (1814)*; *Foley* v. *Wontner, 2 Jac. & W. 245 (1820)*; *Milligan* v. *Mitchell, 3 Myl. & C. (at p. 83) (1837)*; *Watson* v. *Jones, 80 U. S. 679 (1871).* The procedure indicated in these cases is quite aside from the case in hand.

It is suggested that these complainants may have some standing by right of a reverter for a breach of the trust. To this it is enough to say that, although lands may revert to an owner

or his heirs by reason of a breach of a condition, no such result flows from the violation of a trust. This court has already pointed this out. See *Mills* v. *Davison, 54 N. J. Eq. (9 Dick.) 659, 667 (1896).*

Is it to be said that the complainants have a standing in court as possible beneficiaries, having some right, not as created by a breach of trust, but as existing from the time of the original donation, although dormant? It is obvious that no relief can be accorded to the complainants on this theory. The bill does not pray any declaration of their personal rights or any relief appropriate thereto; the proofs do not show that the charity has wholly failed, or cannot possibly be executed; and their counsel has expressly stated in this court that the complainants make no claim to the fund at this time. Furthermore, it may be observed that, if the complainants should seek any such relief, the end of their contention would be not the administration and enforcement of the charity but its termination. In such a case it is proper that the attorney-general, as representing the state, should be made a party defendant. He is the protector of the indefinite and fluctuating body of persons who are interested in the estate or fund; their beneficial interest he represents. See, on this point, *Tud. Char. Trusts (2d ed.) 161, 162; Tud. Char. Trusts (3d ed.) 323, 325; 1 Dan. Ch. Pr. (4th Am. ed.) 136, 138; Cook* v. *Duckenfield, 2 Atk. 562, 564 (1743); Corporation of Sons of Clergy* v. *Mose, 9 Sim. 610, 613 (1839); Skinners Company* v. *Irish Society, 12 Cl. & F. 425, 452 (1843–45); In re Templemoyle School, 4 Ir. Eq. 295, 300 (1869).*

Lastly, it is urged that the complainants have a standing in court as visitors. This averment brings up for our consideration the nature and extent of the doctrine of visitation.

A visitor is an inspector and judge (*Whart. Lex., ad verbum; Bouv. Dict., ad verbum; 12 Encycl. L. of Eng. 483 (3),* and his visitation is a judicial visit or perambulation. *Whart. Lex., ad verbum; Bouv. Dict., ad verbum; Tud. Char. Trusts (3d ed.) 80.*

Corporations only are visited, and these within three classes—ecclesiastical, civil and eleemosynary. *1 Bl. Com. (Lewis' ed.)*

*480; 2 Kent. Com. (14th ed.) *300.* In England, ecclesiastical corporations were those in which the members composing it were altogether spiritual persons, such as bishops, parsons, vicars, and deans and chapters. Such were erected for the furtherance of religion and perpetuating the rights of the church. *1 Bl. Com. *469.* These were visitable by the ordinary *(1 Bl. Com. *480)* ; or, in cases of royal foundations, free chapels and donatives, by the founder, whether the crown or a subject. *12 Encycl. L. of Eng. 482.* Civil corporations were such as were created for a variety of temporal purposes. Such were the mayor and commonalty, for the good government of a district; trading companies, for the advancement of manufactures and commerce; church wardens, for the conservation of the goods of the parish. *1 Bl. Com. *470.* These were subject to the jurisdiction of the king's bench; that is to say, to the visitation of the crown, exercisable in that court. *1 Bl. Com. *480, *481; 12 Encycl. L. of Eng. 482.* Eleemosynary corporations were created for the perpetual distribution of the founder's bounty. Such were, for the most part, hospitals for the maintenance of the poor, sick and impotent, and colleges and schools for the promotion of piety and learning, and for affording assistance to their members. *3 Steph. Com. (14th ed.) 3, 4.* Such were visitable, in most instances, by the founder *(fundator perficiens)* in virtue of the dotation. *1 Bl. Com. *481; 12 Encycl. L. of Eng. 482; 3 Steph. Com. (14th ed.) 12.*

In our own state, under the Religious Societies Act *(3 Gen. Stat. p. 2735)*, a religious society presents a threefold aspect— the congregation, made up of those who meet for worship and instruction; the church, composed of those entitled to full church privileges; and the trustees, or church corporation. *Miller v. Baptist Church, 16 N. J. Law (1 Harr.) 251, 253 (1837).* Under the act of 1872 *(3 Gen. Stat. p. 2759)*, a presbytery may be said to present a twofold aspect—the Presbytery, a strictly spiritual body or court *(Moore's Presbyterian Digest of 1898 177, 190)*, and the Trustees, or presbyterial corporation. Neither the church corporation nor the presbyterial corporation is strictly ecclesiastical in the English sense, inasmuch as the former is composed wholly of laymen; the latter, partly so. Nevertheless

our laws class them as "religious;" and such, indeed, they are, the church corporation taking, in part at least, the place of the rector and church wardens of the established Church of England (*3 Steph. Com. 646, 649, 664, 678*), and the presbyterial corporation taking a somewhat similar place with respect to the property of the presbytery. Whether these corporations are civil or eleemosynary, in the English sense, is a question not easy of determination, for if we observe, on the one hand, that they are but the civil arm of the church or presbytery to hold and manage their temporalities, we may observe, on the other, that they may, and often do, acquire lands and goods of private dotation, and that the real object of their existence is to employ these lands and goods for the welfare of men, without profit or reward. Interesting as this question is, both in itself and in its bearing upon the mode of visitation, we need not now determine it; for, although we should assume that such corporations are eleemosynary, or, with Chancellor Kent (*2 Kent Com. (14th ed.) *274*), that they are ecclesiastical, and that, in respect of the lands or estate in question, the original donor, George R. MacKenzie, might have reserved to himself and his heirs visitatorial powers over the trustees of the Scotch Church and over The Trustees of the Presbytery of Jersey City, we have not established the standing of the complainants in this suit.

When a charity rests upon a private endowment, the founder and his heirs become, by the dotation, under the principles already stated, the legal visitors; nevertheless, the founder may delegate his power of visitation, either generally or specially, and no technical or precise form of words is necessary for the appointment of either a general or special visitor. *Tud. Char. Trusts (2d ed.) 119; Tud. Char. Trusts (3d ed.) 74; 2 Kent Com. (14th ed.) *301.* In *Dartmouth College* v. *Woodward, 17 U. S. 518, 694 (1819)*, Justice Story, citing English cases, declared that it is sufficient if from the nature of the duties to be performed it can be inferred that the founder intended to part with the right of visitation, and that when the appointment is made in general terms the whole power of visitation vests in the appointee. In *Attorney-General* v. *Talbot, 3 Atk. 662, 673 (1747)*, Lord Hardwicke held the chancellor of the University

of Cambridge to be general visitor of Clare Hall, the appointment to be inferred from the fact that branches of visitatorial power had been given to him; that the power to interpret the statutes had been conferred upon him; and that the founder's heir had been excluded.

Furthermore, when the founder has thus appointed a general visitor, and for some cause the latter's functions shall have been suspended, as, for example, when rights and powers shall have so centered in one person that the rule that the same person cannot be both visitor and visited shall come into play, the power of visitation does not, *ipso facto,* return to the founder or his heirs, but is exercised through the courts of the land, properly invoked. *Tud. Char. Trusts (2d ed.) 129, 130; Tud. Char. Trusts (3d ed.) 80, 81; 2 Kent Com. (14th ed.) *303, *304.* In *Rex* v. *Episc. Chest., 2 Str. 797 (1728),* a *mandamus* issued to the bishop, as warden of Manchester College, and he returned that he was visitor; in argument, it was urged that the two offices being in the same person, he could not visit himself, and that there was no case shown wherein the founder had once granted the whole visitation out of him, and, on a temporary suspension, it had resulted back; the *mandamus* was then made peremptory, the court saying "the ground of our interposing is that at present there is no other visitatorial power in being." This case was relied upon in *Green* v. *Rutherforth, 1 Ves. Sr. 463, 471 (1750).* In *Sanderson* v. *White, 35 Mass. 328, 339 (1836),* Chief-Justice Shaw said that the trustees of a charitable trust are within the superintending power of a court of equity, not as of itself possessing visitatorial power, but as possessing a general jurisdiction over trusts, and that in such cases the interest of the public—or, what is the same thing, of the general and indefinite objects of the charity—would be represented by the attorney-general. In the case last cited, it may be remarked, the right of heirs, as visitors, to maintain a suit in equity was denied (see *p. 339*).

If, now, we recur to the two deeds of donation, we find that the church, manse and lands were conveyed to the Trustees of the Scotch Presbyterian Church upon trusts which in their primary limitations were for the benefit of the religious society

meeting in that church for worship and instruction, one of the provisions being that the church organization should be under the care of the Presbytery of Jersey City and its legitimate Presbyterian successors; and we find, also, that in the secondary limitations it was required that the property should vest in and the trusts be executed by the Presbytery of Jersey City and its legitimate Presbyterian successors. In the use of the words "the Presbytery of Jersey City and its legitimate Presbyterian successors," there seems, at the first glance, some confusion, inasmuch as we have already perceived the twofold aspect of a presbytery—as a strictly spiritual body or court, the body usually had in contemplation by the church; and as a presbyterial corporation, the body usually had in contemplation by the courts. A little reflection, however, will dispel the difficulty. A natural person, to whom property, real or personal, is conveyed or assigned upon trust, is none the less a single person or trustee because he has a dual or even a trinal nature, to wit, a spiritual nature, which may be moved by considerations of right and wrong; an intellectual nature, influenced by the rules of worldly prudence and of law; and a physical nature, through which the purposes and resolves of the immaterial being are manifested and wrought out. So, too, we may regard the presbytery as one, yet having at least a dual nature, and we may read the words above quoted as referring to the spiritual body and its particular functions, or to the trustee body and its particular functions, as may be necessary and proper.

Holding together before our minds the law of visitation, as already expounded, and the language of the deeds of gift respecting the functions of the presbytery and its successors, we see plainly indicated that it was the purpose of the donor or founder that the power of visitation should be lodged in the presbytery and its successors, acting as a church court, in things spiritual; acting by and through the trustee body, in things material; that the terms of the appointment being general, the whole power of visitation was vested in the appointees, to the exclusion of the donor and his heirs; and that, although the estate or fund in question has now passed into the legal possession of the Presbytery of Jersey City, by and through the trustee

body, so that the power of visitation in the general appointees is suspended, yet thereby the power does not return to the heirs of the donor; nevertheless, the trust remains subject to the superintending power of the courts. The exercise of such super-intending authority the present complainants, upon their own showing, have no right or power to invoke. They appear to have no immediate interest in the questions involved.

Our last question—is the complainants' suit well conceived—has been measurably answered already, but it is now our task to show why the suit is not well conceived, and, incidentally thereto, what proceeding might be proper.

Tyssen, in his work on *Charitable Bequests, ch. 39, Tit. Procedure,* arranges in four great classes the principal cases in which litigation arises respecting charity property. Firstly, there may be wrongs to be redressed or relief to be sought, for which actions at law or suits in equity might lie, if the charity estates or funds were the private property of the trustees of the charity. In such cases, ordinary actions at law or suits in equity would be maintainable by the trustees against strangers. Secondly, a testator may make a charitable disposition by his will, and questions be raised as to its validity or the proper means of carrying it out. In such cases, the questions could be considered in an ordinary suit to administer his estate, or, occasionally, could be considered in other suits which come before the court under other branches of its jurisdiction. Thirdly, the trustees of the charity might improperly sell or lease the property to some person having a knowledge of the trust. Fourthly, the trustees of the charity might apply the property to wrong objects or appro-priate it to their own use. In the third and fourth classes of cases, Tyssen remarks that our legal ancestors appear, for a time, to have felt a difficulty as to who was the proper person to bring a suit. At length, however, it came to be established that the attorney-general, as representing the crown, was the proper per-son. The suit had to be brought in the court of chancery, be-cause that was the proper court for the enforcement of trusts, and the attorney-general came before it, not as a suitor com-plaining of an injury done to himself, but as one officer of the crown calling the attention of another officer to the neglect, on

the defendants' part, of the performance of a public duty. Hence the pleading was called, not a bill of complaint, but an information; and, as the crown had intervened merely for the protection of some of its subjects, the attorney-general was said to be the informant. If he sued at the relation of others, these parties were termed the relators, and the proceeding was called an information *ex relatione.* It may further be remarked of these cases that it became established that any person might act as relator in a charitable information without having the least beneficial interest in the administration of the charity, and that if this appeared on the face of the pleading, the latter was an information purely; but if any interest in the relator was set up, the pleading was an information and bill. See, on these points, *1 Dan. Ch. Pr. (4th Am. ed.) 8, 10, 11; Tys. Char. Beq. 514, 517; Tud. Char. Trusts (2d ed.) 148, 149, 156; Tud. Char. Trusts (3d ed.) 89, 315, 316, 317; Story Eq. Pl. (10th ed.) §§ 8, 49.*

If we turn to our judicial history, we perceive how well that which Tyssen has written accords with our own procedure. Taking up his second class of charity cases, we remember that suits for the administration of the estate of a deceased person are brought in equity, and rest on four grounds of equitable jurisdiction—the execution of trusts, the taking of accounts, the compelling of discovery and the inadequacy of any remedy at law. *1 Story Eq. Jur. (13th ed.) §§ 531–534.* Likewise, that among administration suits, or cognate thereto, are those for the construction of wills and the direction of executors and trustees, also brought in equity and resting on two or more of the jurisdictional grounds above mentioned. Under this second class, we may then arrange *Norris* v. *Thomson's Executors, 19 N. J. Eq. (4 C. E. Gr.) 307 (1868)* ; *S. C. on appeal, 20 N. J. Eq. (5 C. E. Gr.) 489; Taylor's Executors* v. *Trustees of Bryn Mawr College, 34 N. J. Eq. (7 Stew.) 101 (1881)* ; *Brown* v. *Pancoast, 34 N. J. Eq. (7 Stew.) 321 (1881)* ; *Hesketh* v. *Murphy, 35 N. J. Eq. (8 Stew.) 23 (1882)* ; *S. C. on appeal, 36 N. J. Eq. (9 Stew.) 304; Trustees* v. *Wilkinson, Executor, 36 N. J. Eq. (9 Stew.) 141 (1882)* ; *S. C. on appeal, 38 N. J. Eq. (11 Stew.) 514; Claypool* v. *Norcross, 42 N. J. Eq. (15 Stew.)*

*545* (*1887*) ; *S. C. on appeal, 44 N. J. Eq.* (*17 Stew.*) *522; Hutchins' Executor* v. *George, 44 N. J. Eq.* (*17 Stew.*) *124* (*1888*) ; *S. C. on appeal, 45 N. J. Eq.* (*18 Stew.*) *757; Smith* v. *Smith, 54 N. J. Eq.* (*9 Dick.*) *1* (*1895*) ; *S. C. on appeal, 55 N. J. Eq.* (*10 Dick.*) *821; Jones* v. *Watford, 62 N. J. Eq.* (*17 Dick.*) *339* (*1901*) ; *S. C. on appeal, 64 N. J. Eq.* (*19 Dick.*) *785; Bruere, Executor,* v. *Cook, 63 N. J. Eq.* (*18 Dick.*) *624* (*1902*) ; *Hyde's Executors* v. *Hyde, 64 N. J. Eq.* (*19 Dick.*) *6* (*1902*), and *Pennington* v. *Metropolitan Art Museum, 65 N. J. Eq.* (*20 Dick.*) *11* (*1903*). Furthermore, of the collateral cases in Tyssen's second class, we have several examples, notably *Mills* v. *Davison,* which was originally brought for the foreclosure of a mortgage. *Mutual Benefit Life Insurance Co.* v. *Grace Church, 53 N. J. Eq.* (*8 Dick.*) *413* (*1895*). If, in one or more of these cases, strict regard for practice would have made it proper that the attorney-general be made a party, all that need be said now is that the matter was passed *sub silentio,* and such cases are not authority, in point of practice, either *pro* or *con.* In the present case we do not thus pass over the matter, inasmuch as the standing of the complainants as suitors has been positively denied by the defendants. Taking up Tyssen's fourth class of charity cases (within which the cause *sub judice* plainly belongs), we find, in our reports, *Attorney-General* v. *Moore's Executors, 18 N. J. Eq.* (*3 C. E. Gr.*) *256* (*1867*) ; *S. C. on appeal, 19 N. J. Eq.* (*4 C. E. Gr.*) *503,* in which the procedure by an information of the attorney-general *ex relatione* was followed, the relator, Bishop Bailey, having no personal interest in the charity; *Green* v. *Blackwell, 35 Atl. Rep. 375* (*1896*), in which such procedure was pointed out as the one proper to be followed; and *Lanning* v. *Commissioners of Public Instruction of Trenton, 63 N. J. Eq.* (*18 Dick.*) *1, 8* (*1902*), in which such procedure was approved, but, under the circumstances, waived.

In the case in hand, the persons interested in the estate or fund, being an indefinite or fluctuating body, are properly represented only by the attorney-general; and only he, or the Presbytery of Jersey City, by and through the body charged with the duties of trusteeship, or some member of that body, can

acquire or have a standing to invoke the action of the courts touching the due administration of the trusts.

It must not, however, be inferred, from the fact that the right of the present complainants to maintain their suit has been denied, that the use of the estate or fund proposed by the Presbytery of Jersey City, and revealed by the pleadings, meets with our approval. Evidently such use is not in exact accord with the original intent of the founder, and it can be permitted, if at all, only after the whole case shall have been fully disclosed in the court of chancery, either upon an information filed by the attorney-general (probably *ex relatione*), as representing the undefined beneficiaries of the charity, against the Presbytery of Jersey City, in and through its trustee body, or upon a bill exhibited by the presbytery, by and through its body charged with the duties of trusteeship, in which the attorney-general, as representing the beneficiaries, should be made a party defendant. In the proceedings upon such information or bill, if it appears that the trust cannot be literally executed, there should be presented to the chancellor, for approval, either directly or by an inquiry in the master's office, a scheme for the due administration of the charity within the limits of the judicial doctrine of *cy pres,* as hereinbefore accepted. Until such course shall have been pursued, it will be the duty of the proper presbyterial body to preserve the fund intact, and the attorney-general should take care that such duty is not violated.

6. The decree of the court of chancery should be reversed, but, of course, without prejudice to any further or other proceedings of the nature hereinbefore indicated. The reversal will be with costs.

*For affirmance*—PITNEY, BOGERT—2.

*For reversal*—DIXON, GARRISON, SWAYZE, VREDENBURGH, VROOM, GREEN, GRAY—7.