NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0643-10T3

BERNARD and JEANNE ADLER,

    Plaintiffs-Respondents,

v.

SAVE, n/k/a SAVE, A FRIEND
TO HOMELESS ANIMALS,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| August 5, 2013 |
| APPELLATE DIVISION |

Argued November 16, 2011 - Decided August 5, 2013

Before Judges Fuentes, Harris, and Koblitz.

On appeal from Superior Court of New Jersey,
Law Division, Mercer County, Docket No.
L-2611-07.

Sara F. Merin argued the cause for appellant
(McCarter & English, LLP, attorneys; Gerard G.
Brew, of counsel and on the briefs; Ms. Merin
and Carissa L. Rodrigue, on the briefs).

Stuart J. Polkowitz argued the cause for
respondents (Brach Eichler L.L.C., attorneys;
Mr. Polkowitz, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

    This appeal requires us to address the enforceability of a

conditional inter vivos gift.  Guided by the facts presented

here, we hold that a charity that solicits and accepts a gift

from a donor, knowing that the donor's expressed purpose for making the gift was to fund a particular aspect of the charity's eleemosynary mission, is bound to return the gift when the charity unilaterally decides not to honor the donor's originally expressed purpose.

Absent the donor's consent, the recipient of the gift is not at liberty to ignore or materially modify the expressed purpose underlying the donor's decision to give, even if the conditions that existed at the time of the gift may have materially changed, making the fulfillment of the donor's condition either impossible or highly impractical. When, as here, the donor is alive and able to prove the conditional nature of the gift through his or her testimony and other corroborative evidence, a reviewing court's duty is to enforce the donor's original intent, by directing the charity to either fulfill the condition or return the gift.

Here, Judge Thomas W. Sumners, Jr., sitting also as the trier of fact, came to the same legal conclusion after hearing the evidence presented by the parties over a two-day period. The following facts, derived from the evidence presented in this bench trial, will inform our legal analysis.

A-0643-10T3

Defendant SAVE, n/k/a SAVE, A Friend to Homeless Animals (SAVE), was founded in 1941 as a non-profit animal shelter located in the greater Princeton area. Recognized as a charitable organization under 26 U.S.C.A. § 501(c)(3), defendant's self-proclaimed mission is to provide for the rescue, shelter, veterinary care, and adoption of stray companion animals in the region.[1] Plaintiffs Bernard and Jeanne Adler shared defendant's concern for the welfare of animals, especially for larger dogs and older cats.

Bernard Adler is a civil engineer and real estate developer by profession. His interest in caring for dogs and cats has spanned for at least thirty-eight years, the same amount of time he has been married to his wife, co-plaintiff Jeanne Adler. Over this timeframe, plaintiffs had three sons and cared for "numerous dogs and cats."[2] Plaintiffs lived in the Princeton Township area throughout this entire time.

According to Mr. Adler, he and his wife became interested in SAVE because it was "a no-kill shelter." This policy was

---

[1] The term "region" includes the Borough of Princeton, which was established on January 1, 2013, through the consolidation of the Borough of Princeton and Princeton Township.

[2] When asked to estimate the number of animals he and his wife had adopted over their thirty-eight years of marriage, Mr. Adler responded: "about 30 animals."

A-0643-10T3

extremely important to plaintiffs because "a lot of animals are put into . . . shelters and if they don't get adopted quickly, then they get euthanized."

At the time of trial in 2010, plaintiffs had recently "rescued" a "120-pound Bernese Mountain Dog and a 105-pound Newfoundland, both that wouldn't have been adopted from shelters because they were too wild." The total number of animals they have had living with them at any one time include three dogs and four cats; one of their sons also had a Bernese Mountain Dog that stayed with them "close to half a year." The smallest dog weighed 82 pounds; the heaviest was the then recently rescued 120-pound Bernese Mountain Dog.

Plaintiffs' first involvement with SAVE began in the early 1990s, when a trainer they knew introduced them to the organization. At first, their involvement with SAVE was limited to bringing extra animal food and toys to SAVE's facility and spending time with wayward and feral cats. Mr. Adler in particular spent time attempting to humanize feral cats because, otherwise, there is "little hope" of adoption. In addition to these personal acts of kindness, commencing around 1992, plaintiffs began making financial donations to SAVE.

Mr. Adler testified that the financial contributions were relatively small at first. "It would be anywhere from a couple

of hundred dollars to a thousand, fifteen hundred dollars." They also began attending fundraisers, "getting as many things as [they] could to get involved with, and give [SAVE] extra donations that way." Plaintiffs made these financial donations without specific conditions, expecting only that the funds would be used "for the general maintenance of the animals. To buy them food, shelter." Occasionally, plaintiffs would receive a letter from SAVE informing them that "X number of dollars would serve to handle X number of operations for dogs that needed it or required it. Nothing specific, no."

## II

Sara Nicolls served as SAVE's Executive Director from May 1999 to 2005. At the time the SAVE board of trustees hired her, its main concern was how to address the problems associated with renovating an antiquated facility that was constructed in the 1940s. Ms. Nicolls testified that, despite the minor improvements that had been made over time, the building did not meet modern housing standards and its internal physical layout was inconsistent with basic notions of sound animal husbandry.[3]

_____

[3] By way of example, cats and dogs were housed in the same area, which tended to increase the stress caused by being placed in a shelter. Animals that were brought to the shelter from the street by animal control officials were not properly isolated from the general population; this facilitated the spread of communicable diseases and made the "street animals'" adjustment

(continued)

Early in Ms. Nicolls's tenure, the board of trustees spent a great of deal of time discussing the best way to resolve these problems and remain consistent with the charity's core mission, because "[t]he property was left in trust with lifetime income based on the fact that the physical plant would continue to operate in Princeton and also service the Animal Control of Princeton Township."

After discussing the expansion of services required and the limitations associated with operating within an urban environment, the board retained an architectural firm to design a new shelter facility. The architect the board selected had designed a similar facility in Richmond, Virginia. As Ms. Nicolls explained:

> The reason why that one was chosen was because it was essentially the same situation. It was an urban setting where they had a physical limitation. All of the animals -- all of the animal process was held indoors and we knew there was a possibility, because of the close proximity to neighbors and noise from that, that we would need to design a building where all of the functions for animal welfare would be housed inside . . . And [that architect] was chosen specifically because they were in a similar situation.

---

(continued)
period more difficult. There were also problems with the building's air exchange system, which caused "a huge outbreak" of upper respiratory problems in kittens.

A-0643-10T3

As approved by the board, the original plans the architect prepared depicted a large facility, encompassing approximately 35,000 square feet. The facility would provide separate living areas for cats and dogs, areas designed for isolation and rehabilitation, and areas for spaying and neutering, including an on-site veterinary clinic with x-ray equipment for treatment and triage of sick and injured animals. Ms. Nicolls expected this would greatly reduce SAVE's $40,000 annual medical expenses, incurred mostly for transporting animals to off-site facilities for treatment and day-to-day services. There were also accommodations for larger dogs, designed as "dog living rooms." These rooms provided "a more natural environment" for dogs accustomed to a domestic setting. However, Ms. Nicolls did not mention that any special arrangements had been made to provide similar care for older cats.

Another major problem with the old facility, located at Herrontown Road in Princeton Township, was a lack of space for administrative staff and community educational services. The proposed facility provided for a second floor designed to hold classes for school children, conferences, and office space for administrative staff. In response to a direct question from plaintiffs' counsel, Ms. Nicolls confirmed that this was the

7

"basic plan that was approved by the board before [she] went into the fundraising campaign."

According to Ms. Nicolls, the capital campaign began by first asking the board members to "put their money where their mouth was" by way of matching grants. As the president of the board of trustees, Carol Hildebrandt accepted the challenge with gusto, by pledging one million dollars, "that she would match dollar for dollar, [for] every dollar raised." The fundraising campaign next focused on a select group of historically loyal and generous supporters. This elite class of donors was invited to a spring benefit event, where Ms. Nicolls personally solicited their support for the proposed new facility at Herrontown Road.

Plaintiffs were among the guests at this event. Ms. Nicolls testified that plaintiffs approached her and "said that they were very interested in the project." After she explained all of the various features of the project, she showed them the proposed plans and gave them a DVD that talked about the challenge grants. Ms. Nicolls testified that plaintiffs, whom she described as long time "very generous donors," told her that

> they had adopted several animals and have a
> couple of large dogs so they were very
> specifically interested in the dog living
> rooms and helping for the large dogs and
> then they have elderly cats and they were
> interested in a cat living room as well.

A-0643-10T3

Ms. Nicolls testified as follows in response to questions posed by plaintiffs' counsel:

> Q. Did you show them when you met with them where on the proposed plans you had special accommodations for large dogs?
>
> A. Correct. We went over the plans in great detail, and those are the areas they were looking to be interested in.
>
> Q. Okay. And [Mr. Adler] asked you questions about the plans?
>
> A. Yes.
>
> Q. And did [Mrs. Adler] ask you questions about the plan?
>
> A. Correct.
>
> Q. And you pointed out to them where there was a special accommodation made for large dogs?
>
> A. Correct.
>
> Q. And how about for cats? Did you go through the same process with them?
>
> A. Yes. As I said, they had adopted their cats and they were very interested in that particular (indiscernible).
>
> Q. Now, at some point, did the Adlers commit to a pledge with regard to the proposal that you were showing for the new design at Herrontown Road?
>
> A. Yes. We had the kennels campaign, the naming opportunity and those, in particular, were the ones that they were interested in.
>
> Q. Which one were they interested in?

9

A. The dog living room and a cat living room.

Q. And they were specific about why they were making these donations?

A. Yes.

Q. And besides yourself, are you aware of anyone at SAVE that the Adlers met with in connection with these contributions?

A. I'm sure that they met with Carol Hildebrandt that they would begin matching dollar for dollar.

As the last witness to testify,[4] Ms. Nicolls's testimony corroborated plaintiffs' account of events in all material respects. According to Mr. Adler, Ms. Nicolls emphasized to him that the new facility would have "different rooms in it, . . . for keeping animals that would have more time in the shelter, larger dogs, older cats that don't get an adoption that readily." As soon as Mr. Adler told Ms. Nicolls that he and his wife were interested in contributing to support the project, she told him that "there were naming rights to certain things in the facility." Although some of the naming rights to certain areas had already been taken, Ms. Nicolls told him that "<u>she felt that</u>

_____

[4] The trial court permitted plaintiffs to call Ms. Nicolls out of order. Therefore, she testified after defendant's one and only witness had completed his testimony.

10

[plaintiffs] could still get nam[ing] rights for a large dog and older cat facility." (Emphasis added).

Marked in evidence as a joint exhibit at trial, and included as part of the appellate record, is a document denoted: "SAVE Expanding the Mission: Capital Campaign Case Statement." Ms. Nicolls gave a copy of this brochure to Mr. Adler. The document provides a narrative overview of SAVE's history, core mission, expansion goals that incorporate the latest methods for the humane treatment of wayward dogs and cats, with the ultimate goal being adoption, and the spatial arrangement of the facility, including areas designated as a "Dog Rehabilitation/ Holding Area."[5]

Of particular relevance here, the brochure includes a paragraph denoted "SAVE's Request," which reads as follows:

> Support as our public campaign gets underway is vital. In gratitude for a major gift we would be pleased to name the building or a portion of it for the you [sic] or anyone you would choose to honor. A successful campaign will mean life itself to the many strays we have to turn away. Once in our care, they could bring much joy to the new families who would meet them at SAVE. Together we can build a shelter that

---

[5] The brochure indicates that the facility would include: "A quiet, stress-free environment where specially trained staff can address individualized animals' needs becomes key to successful recovery and future adoption. Plans for this area include prep space, large dog and small dog kennels, and areas to accommodate litters of puppies, mother dogs and their offspring."

11

> truly reflects our mission to protect the
> health and welfare of homeless animals and
> strengthen the bonds between humans and
> companion animals.
>
> [(Emphasis added).]

This statement is immediately followed by a page listing the donation amount required to receive naming rights to particular areas or rooms in the new facility. For a donation of one million dollars, the donor would get the honor of having the building named after himself or herself, or anyone else the donor chooses. The amount of the donation decreased relative to the character of the naming area selected.[6]

Mr. Adler testified that Ms. Nicolls told him that, for a gift of $25,000, he and his wife would receive the naming rights of a particular facility. Mr. Adler agreed to donate a total of $50,000. As he explained, "[t]he purpose was to have rooms for large dogs and older cats that are not easily adopted and specifically for the naming rights for those rooms at that facility on Herrontown Road."

Mr. Adler conceded that he did not specifically discuss with Ms. Nicolls what would occur if the facility were not

---

[6] As the record shows, the president of the SAVE board of trustees pledged a one million dollars matching gift, thus acquiring the honor of naming the building after herself or anyone else she designated. In the interest of clarity, we have attached a copy of this document as Appellate Court Appendix I.

constructed. However, Mr. Adler testified that, based on his business background, he expected the recipient of the donation to honor, in good faith, the express purpose of his gift. He testified as follows:

> There was no specific discussion, but I'm in business and when you make a donation for a specific purpose, specific naming rights in this instance for a facility to be built, if the facility doesn't get built, you return the money. It's the same thing as in buildings that we own. If a tenant wants something done in a building and we agree to an amount that it would cost them, they put up the money and we do the facility for them. If they don't put up the money, we don't do it. And if they do put up the money, we have to produce. Otherwise, we give them their money back.

On December 23, 2002, plaintiffs issued a personal check to SAVE in the amount of $5000. The memo of the check simply stated: "Donation." A SAVE staff member issued a receipt to plaintiffs with the caption: "General Donation." However, under her signature, the staff person who acknowledged receipt of the check wrote: "restricted for expansion."

Plaintiffs issued another personal check to SAVE on December 30, 2003, in the amount of $10,000; the memo of the check again merely stated: "Donation." On December 31, 2003, plaintiffs issued a third personal check to SAVE in the amount of $10,000; unlike the other two checks, however, this check did not have a memo notation.

Plaintiffs made their final donation installment in the form of a gift of shares of stock. A receipt from SAVE dated July 2, 2004, shows that plaintiffs donated "455 shares [of] CBH stock"; the SAVE representative who attested (but did not sign) the receipt of the donation noted that the "average" price per share of this stock was $53.13, resulting in a donation by plaintiffs totaling $24,174.15 (where $53.13 per share at 455 shares equals $24,174.15).

On January 20, 2003, Ms. Nicolls wrote to plaintiffs in her capacity as SAVE Executive Director, acknowledging their "very generous gift of $5,000 on December 24, 2002 for SAVE's capital campaign."

By letter dated December 31, 2003, written on SAVE's stationary, Ms. Nicolls acknowledged receipt of plaintiffs' $20,0000 donation. After thanking plaintiffs for their generosity and continued commitment to the welfare of animals, Ms. Nicolls stated that plaintiffs' donation would assist SAVE "to accomplish a long-held vision for urgently needed capital expansion with enhanced programs and services for cats and dogs." Addressing plaintiffs' specific purpose underlying their donation, Ms. Nicolls wrote:

> I especially appreciate your commitment
> to the project as we begin the public phase

A-0643-10T3

of the campaign. <u>Enclosed is a naming opportunity form.</u>[7] <u>Please return it to us at your convenience. We are pleased to honor the many pets you share your lives with. We are especially touched that you want to fund a space for large dogs that may spend more time with us before they are adopted.</u>

[(Emphasis added).]

On July 22, 2004, again in her capacity as SAVE Executive Director, Ms. Nicolls thanked the Adlers for their donation of stock. Although she mentioned that "a new residence for homeless animals will allow SAVE to take significant steps forward to fulfill its mission of serving animals and humans in the Greater Princeton Area," she did not mention plaintiffs' specific interest in larger dogs and older cats.

Mrs. Adler's testimony corroborated her husband's account of events in all material respects. She described how her upbringing influenced her life-long commitment to philanthropic activities; in her own words: "My family volunteers, we learned it from my dad." Her activities safeguarding the welfare of animals began early on in her life. She described rescuing injured and malnourished stray dogs and nursing them back to health. She also worked in an animal shelter when she lived in

---

[7] Mr. Adler testified that he and his wife did not discuss in great detail the naming form at the time, explaining as follows: "Naming wasn't our big thing. It wasn't important yet and they told us that we had plenty of time to do that."

Whitehouse, an unincorporated community within Readington Township. Mrs. Adler summarized her and Mr. Adler's commitment to the welfare of animals as an integral part of their lives: "That's what we do. That's who we are."

Mrs. Adler testified that the decision to donate $50,000 to SAVE represented, in historical terms, a significant expansion of their financial support for the care of animals, especially large dogs and older cats. She made this point clear in response to a question posed by her attorney:

> First of all, we had never given money for that amount and so we were very specific with [Ms. Nicolls] and to say that this is what we would do for the shelter; you know, that this was presented as real opportunity to us because [Ms. Nicolls] knew that our heart was with large dogs and older cats.

According to Mrs. Adler, representatives from SAVE told her that, in recognition and appreciation for their $50,000 donation, SAVE would designate two rooms in the new facility, one specifically designated for the care of large dogs and the other exclusively dedicated for the care of older cats. Finally, in addition to the satisfaction of having performed a good deed, they would also have nameplates outside each room recognizing them as the individuals responsible for their creation.

A-0643-10T3

As was the case with her husband, Mrs. Adler never discussed with any representative from SAVE what would happen if SAVE decided not to construct "the type of facility" described to her and her husband. In her words: "Maybe I'm a little Pollyanna[8] but I really believed it was going to be built."

In February 2006, defendant announced to its donors, including plaintiffs, that it was merging with another charitable foundation. As a result, SAVE would not construct its new shelter at its original Herrontown Road location. The newly formed "merged charity" was transferring all operations formerly housed at Herrontown Road to a location in Montgomery Township, where it planned to construct a new animal shelter, significantly smaller than the facility originally proposed to be built at Herrontown Road.

This announcement came as a total surprise to plaintiffs. Mr. Adler testified that he made several unsuccessful attempts to speak to the executive director and played "telephone tag" with board of trustee member John Sayer. Mr. Adler did not

---

[8] "Pollyanna" is the main protagonist in a novel of the same name. It was written by noted American fiction writer Eleanor Porter and first published in 1913. The novel's popularity transformed the character's name into a word that describes "a person characterized by irrepressible optimism and a tendency to find good in everything." Pollyanna, Mirriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/pollyanna (last visited July 29, 2013).

A-0643-10T3

suggest, however, that Mr. Sayer or anyone else at SAVE was intentionally evading his efforts to get more information on the merger and its implications regarding the construction of the Herrontown Road shelter. Mr. Adler explained that the situation with SAVE coincided with a number of personal issues that prevented him from being as available as he would have been otherwise.

Unable to reach a satisfactory resolution, Mr. Adler sent a letter to SAVE requesting the return of his donation. He finally met with Mr. Sayer and explained that he wanted the donation returned "[b]ecause the facility on Herrontown Road was not being built and the specific purpose of the donations w[as] for the building of a facility on Herrontown Road for -- with naming rights for large dogs and older cats." Although Mr. Sayer spoke to him "about things that were being done," Mr. Adler did not "see anything specific, but it didn't make any difference. [Plaintiffs] were interested in a facility on Herrontown Road."[9]

---

[9] On cross-examination, Mr. Adler conceded that he and his wife listed the donations they made to SAVE as charitable deductions on their itemized tax returns for 2002, 2003, and 2004. We presume this line of questioning was intended by SAVE to undermine plaintiffs' credibility by showing that they took full advantage of the tax benefits of their gift.

A-0643-10T3

Mr. Adler also characterized the facility proposed to be built in Montgomery Township as a "substantially" lesser facility than the one originally proposed at Herrontown Road. The first phase of the Montgomery facility called for the construction of a 3000 square foot shelter, which is one tenth the size of the 30,000 square foot facility Ms. Nicolls showed the Adlers at the spring capital fundraising event.

## III

On October 12, 2007, plaintiffs filed suit in the Law Division in Mercer County, seeking the return of the donation they had made to SAVE. Plaintiffs alleged that SAVE accepted their donation fully aware that plaintiffs expected the funds to be specifically earmarked for the stated purpose of constructing two rooms exclusively designated for the care of large dogs and older cats. These rooms were to be part of a larger facility to be constructed at Herrontown Road, in Princeton.

Plaintiffs maintained that SAVE violated this material aspect of their gift by deciding, without their knowledge or approval, to use the funds plaintiffs donated to construct a facility that did not meet plaintiffs' expressed animal-care conditions and would be located in an area outside its original service region. According to plaintiffs, despite several good

faith attempts to convince defendant to voluntarily return their funds, SAVE steadfastly and wrongfully refused to do so.

Defendant filed an answer disputing the conditional nature of plaintiffs' charitable gift. After joinder of issue, the parties conducted extensive discovery, at the conclusion of which both sides moved for summary judgment. The trial court denied summary judgment to both sides and the matter thereafter proceeded to a bench trial.

John Sayer was the only witness called by defendant. A member of SAVE's board of trustees since 2004, Mr. Sayer's principal involvement with SAVE as of the time of trial had been to serve as a member of the financial committee for the new building. He testified that SAVE's "overriding mission" was to operate "an adoption facility." To clarify his point, Mr. Sayer contrasted SAVE's adoption mission to a "sanctuary," which he stated keeps animals "regardless of their adoptability." Mr. Sayer emphasized: "We are not a sanctuary. We are an adoption facility."

Although he was involved in the capital campaign, Mr. Sayer testified that he "was not part of the Adlers' solicitation." In fact, he joined the board of trustees "just after" plaintiffs had made their gift. Mr. Sayer described plaintiffs as "major donors." According to Mr. Sayer, the goal of the capital

A-0643-10T3

campaign was to raise "seven and a half million dollars." The campaign actually raised "one point three million dollars."

When asked by SAVE's attorney "[h]ow much money was spent trying to pursue approvals at the Princeton level," Mr. Sayer responded: "<u>We have insufficient records for all that, but my best guess would be about a quarter of a million dollars that was put into plans and the efforts to deal with the township</u>." (Emphasis added). Mr. Sayer did not attend any planning board meetings; his knowledge of the planning board's reaction to the proposed new facility was based exclusively on the reports given to the SAVE board of trustees by its paid "facilitator."

Overruling plaintiffs' counsel's objection on hearsay grounds, the trial court permitted Mr. Sayer to testify about what the facilitator told the SAVE board of trustees:

> [MR. SAYER]. He reported that the township viewed the new shelter as a new project, because we were going to tear down the entirety of what was there, and their view was, even though the concept of a shelter was grandfathered, it was not a "highest use" for the property and they discouraged us from trying to build such a large facility at that location.
>
> Q. Were there any other issues about the property itself that w[ere] a concern to Princeton, as far you know?
>
> [MR. SAYER]. Well, a lot of that property is wetlands and it also, of course, is very close to the neighbors who had a long history of complaining. And <u>I think that,</u>

> had we gone forward with that, we would have been unsuccessful.

[(Emphasis added).]

In addition to serving on the capital campaign committee, Mr. Sayer also served on the committee responsible for annual fundraising efforts. The monies raised from these activities were intended to defray SAVE's operating expenses. Mr. Sayer testified that two years after he began serving in this committee he realized that there was "a serious financial problem as respects operating funds."

According to Mr. Sayer, during Ms. Nicolls's tenure as SAVE's executive director, the charity's base of support had shrunk "from about 600 people, mostly local, to just over 200 people." Although the remaining 200 individuals were SAVE's largest supporters, according to Mr. Sayer, the charity was losing money, requiring it to draw down from its reserve funds "to meet [its] operating expenses."

At this point in the trial, plaintiffs' counsel objected to defense counsel's "line of questioning." Plaintiffs' counsel argued that whether the charity was operating at a deficit had nothing to do with the specific circumstances "under which the Adlers made a contribution towards the capital campaign and whether the contribution was conditional." The following colloquy ensued:

[DEFENSE COUNSEL]: This is a charity, Your Honor. The issue that's going to be ultimately [decided involves] whether it would be against public policy to . . . require SAVE to return $50,000 in donations. I think Your Honor is entitled to hear about the history of the struggle that they had raising funds.

THE COURT: So are you saying to me my decision should be based on the financial stability or instability of this organization?

[DEFENSE COUNSEL]: No, but I think all the background you have about the Herrontown Road facility is useful. . . .

. . . .

[PLAINTIFFS' COUNSEL]: Your Honor, this case comes down to the solicitation that was made to my clients, the discussions they had with Ms. Nicolls, their understanding of what was being proposed, what they were getting, as was Ms. Nicolls'[s] testimony in the future as to the nature of the conversations, what she proposed, her understanding of the conditions under which the monies were being donated. While I appreciate there may be other economic issues involving SAVE, that's not part of why we're here today. We're here because my clients are presented a particular program and an opportunity to fund a portion of that program. [SAVE] [is] not following through with that program and [plaintiffs] are seeking [the] return of their money, because [plaintiffs] believe that they donated the money on the basis of what was proposed to them, not on the basis of the strength or lack thereof of SAVE, outside of this particular capital program.

THE COURT: Well, I'll allow limited testimony on the financial stability of SAVE as it relates to the ability or the

23

inability to go forward with the particular plans that were solicited, these plans upon which the Adlers were solicited, but only if it relates to the testimony in terms of the operating fund, only if it relates to the decision-making process on going forward with these claims.

[DEFENSE COUNSEL]: That's all I was intending, Your Honor.

From this point, Mr. Sayer testified regarding the overcrowding conditions that existed at the old Herrontown Road facility. Although uncertain as to the actual number of animals that were housed at the time of these alleged deteriorating conditions, Mr. Sayer nonetheless characterized the conditions as bordering on "animal abuse." Mr. Sayer claimed that the Princeton Township Health Department and "the State of New Jersey" were "very concerned about the number of animals and the small space." In response, the board "put a freeze on taking new animals" and set a goal of keeping no more than "15-20 dogs and 55 cats."

Because several of the dogs were not adoptable, Mr. Sayer stated that they were "sent out to sanctuaries." According to Mr. Sayer, they had one case involving a dog that was "so violent," that not even a sanctuary would accept it. SAVE was forced to violate its core founding principle, and the dog was euthanized. "But, other than that, [SAVE] managed to raise the funds to take and reduce the population of animals, to only

A-0643-10T3

adoptable animals. And, from that point on, [SAVE] had excellent operating results with the animals."

Defense counsel asked Mr. Sayer to explain the decision to abandon the Herrontown Road project, merge with "Friends of Homeless Animals," and relocate to Montgomery Township. The decision was driven primarily by an alleged community inability to "discriminate between the two organizations." There was also an implicit -- if not outright -- acknowledgement that both groups were competing for the same limited charitable dollar. In Mr. Sayer's own words: "Both organizations had parallel goals and very parallel fundraising mechanisms."

According to Mr. Sayer, Friends of Homeless Animals had also been "very, very . . . clever and pro-active," by entering into an agreement with the State Department of Corrections (DOC). Through this agreement, the DOC made "a little less than 14 acres" available in Montgomery Township to build an animal shelter. The property also includes a house known as the Van Sant Mansion. Mr. Sayer testified that the first phase of the project would be to renovate and restore the house, which would provide approximately 7000 square feet, "not for animals but for office space and storage." Mr. Sayer specifically noted that SAVE had "<u>a specific million dollars set aside for the restoration of the Van Sant Mansion</u>." (Emphasis added).

The second phase of this venture would involve the construction of an animal shelter in Montgomery Township. The merged charities have approval from Montgomery Township to construct a 3000 square foot facility as the first phase of the animal care project. Mr. Sayer acknowledged that such a structure would be "totally inadequate for [SAVE's] means." Defendant has thus secured approval to construct a 15,000 square foot facility. However, Mr. Sayer testified that he does not believe SAVE "will build a 15,000 square foot shelter" because it is not needed.

With respect to the funds raised by the capital campaign to construct a 30,000 square foot state-of-the-art animal shelter at Herrontown Road in Princeton Township, the campaign to which plaintiffs donated $50,000 to ensure for the long-term care of large dogs and older cats, Mr. Sayer testified as follows:

> We have approximately $967,000 of the original money that was raised for the new shelter left to start on the first phase, whenever that may be, of the new shelter. From the planning prospective [sic], I think we will finish the VanSant mansion, have the foundation work done on the new shelter, and start the new campaign at that point in time.

When asked by defense counsel whether the proposed 15,000 square foot facility in Montgomery Township would "have rooms available of the types of rooms that the Adlers had indicated

A-0643-10T3

that they were -- that they found important," Mr. Sayer answered emphatically: "Absolutely." However, the extensive narrative amplification Mr. Sayer gave as a follow up to this one word answer did not, in any meaningful sense, corroborate or otherwise support his testimony. We therefore decline to belabor this point. Based on Mr. Sayer's testimony and the letter announcing the merger between SAVE and Friends of Homeless Animals, we are satisfied that the 15,000 square foot shelter proposed to be constructed in Montgomery Township does not include two rooms specifically designated for the long-term care of large dogs and older cats.

IV

After considering the testimony of the witnesses, documentary exhibits admitted into evidence, and the arguments of counsel, Judge Sumners held in plaintiffs' favor, finding that they were entitled to the full return of their charitable gift. By order dated August 26, 2010, Judge Sumners entered final judgment against defendant in the amount of $49,174.15 and denied plaintiffs' application for pre-judgment interest.

Judge Sumners found plaintiffs' and Ms. Nicolls's testimony credible and noted "the lack of any testimony by SAVE contradicting their testimony." He found

> apparent that the Adler's [sic] donation was
> motivated by a desire to provide better

conditions for large dogs and older cats. They put their money where their hearts were. Although, all of the Ts were not crossed, and all of the Is were not dotted, it was clear from the Adlers, and Nichols [sic], and the documentary evidence presented at trial, they were only making donations for these reasons.

In this appeal, defendant argues that Judge Sumners erred in finding that plaintiffs' donation was a conditional gift. Alternatively, defendant argues that, even if the gift was conditional, returning the funds to plaintiffs is not warranted because "the condition has been or will be met." Finally, assuming arguendo the absence of merit in these arguments, defendant maintains that the trial court should have reformed plaintiffs' gifts under the doctrine of equitable deviation.

Stated differently, in lieu of returning the funds to plaintiffs, defendant maintains the trial court should have crafted a remedy that would have permitted the charity to spend the funds in order "to effectuate the original purpose of the gift as close as possible." According to defendant, public policy demands that we reverse the trial court because, if we permit this decision to stand, it would be detrimental to charities throughout this State.

We are not persuaded by any of defendant's arguments. We begin our analysis by reaffirming our standard of review. We are bound to defer to the trial court's factual findings, as

long as they are supported by adequate, substantial and credible evidence. <u>Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.</u>, 65 <u>N.J.</u> 474, 483-84 (1974). In a case in which the trial judge also sat as the trier of fact, we are precluded from disturbing the trial judge's factual findings and legal conclusions, "'unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" <u>Seidman v. Clifton Sav. Bank</u>, 205 <u>N.J.</u> 150, 169 (2011) (alteration in original) (quoting <u>Ex rel Johnson</u>, 194 <u>N.J.</u> 276, 284 (2008)).

We are also bound to defer to the trial judge's findings that are "substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." <u>State v. Locurto</u>, 157 <u>N.J.</u> 463, 471 (1999) (quoting <u>State v. Johnson</u>, 42 <u>N.J.</u> 146, 161-62 (1964)). However, we do not owe any deference to the legal conclusions reached by the trial court, because our review of the law is de novo. <u>Borough of Harvey Cedars v. Karan</u>, ___ <u>N.J.</u> ___, ___ (2013) (slip. op. at 33) (citing <u>Manalapan Realty v. Manalapan Twp. Comm.</u>, 140 <u>N.J.</u> 366, 378 (1995)).

Here, the evidence presented at trial can safely be characterized as overwhelmingly supporting Judge Sumners's

credibility findings in favor of the Adlers. Distilled to its essence, the record is uncontroverted that commencing in 2002, SAVE launched a sophisticated fundraising capital campaign, targeting an elite class of historically generous donors.

SAVE wooed these "major donors" with professionally designed brochures containing strategically placed photographs of happy children and their family warmly embracing puppies, kittens, and vulnerable-looking older animals. The caption, prominently appearing next to one of these photographs, contained the following message: "Young Philanthropists. SAVE benefits greatly from the interest of children who become donors. Their highly creative approaches to philanthropy help SAVE's cats and dogs in a variety of ways."

Another section of the brochure labeled "Community Partners" included a photograph of "a retired chemist" who "stays in shape by walking dogs at SAVE." Next to this gentleman's picture was a close-up photograph of a wide-eyed kitten. Of particular relevance to this case, the brochure also mentioned that the retired chemist's "volunteer services to the Princeton community [also] include . . . serving in the reference department of the Princeton Public Library, and doing chemistry demonstrations at local elementary schools." Thus,

30

SAVE wanted to be perceived as an integral part of Princeton's philanthropic community.

This presentation inexorably leads to the final and most important part of the brochure: "Where We Are Going in the Future." Here, SAVE depicted an artistic rendition of its "long-awaited new shelter," which would include

> dedicated spaces for SAVE's programs of Rescue, Shelter, Health and Welfare, Spay/Neuter, Adoption and Humane Education. Highlights include improved spaces for adoption, animal display and cat rehabilitation. New features will include a Humane Education wing with an Atrium that will allow bonding spaces for people and pets, ongoing dog training classes, meetings and celebrations.

Armed with these sophisticated weapons of persuasion, SAVE aggressively solicited the Adlers to contribute to its capital campaign fundraising drive, with the promise of constructing a state-of-the-art animal shelter, approximately 30,000 square feet in size, located at SAVE's historical birthplace, Herrontown Road in Princeton Township.

As a means of attracting their most loyal and generous donors, SAVE conceived "the naming rights" incentive, through which donors able and willing to give "a major gift" ranging from one million dollars to $15,000, received special recognition by having a portion of the building named for the donor or anyone the donor chose.

31

For plaintiffs, their most important preoccupation was to provide a space for large dogs and older cats. Because they believed these types of animals were highly unlikely to be adopted, they wanted to provide a humane environment for their long-term care. Their moral commitment to these animals was so strong that they were willing to donate $50,000 to make this a reality. In the words of Mrs. Adler: "That's what we do. That's who we are."

Ms. Nicolls's uncontroverted testimony established, beyond a rational doubt, that SAVE accepted plaintiffs' generosity, fully aware that it was expressly conditioned upon fulfilling these material conditions. Ms. Nicolls's testimony was corroborated by the letters she wrote, as SAVE's executive director, acknowledging the conditional nature of plaintiffs' donations.

Equally clear is SAVE's unilateral decision not to honor plaintiffs' conditions and rededicate their donations to serve a purpose unrelated to plaintiffs' expressed wishes. To be clear, the record shows that SAVE: (1) decided to construct a substantially smaller facility; (2) outside the Princeton area; (3) without any specifically designated rooms to serve the needs of large dogs and older cats; and (4) without any mention of plaintiffs' names.

Citing 15 <u>Am. Jur. 2d Charities</u> § 145 (2000), SAVE argues that "[c]onditions with a right of reverter or right to demand forfeiture 'will not be implied unless the intendment is clear.'" Accepting, arguendo, this statement to be a correct articulation of New Jersey law, a notion we do not implicitly endorse, the record here makes it clear that plaintiffs expressly announced their conditions at the time they made their gift, and defendant expressly acknowledged those conditions at the time it accepted plaintiffs' gift. Indeed, some of the most salient of plaintiffs' conditions (continued servicing of the Princeton region and naming rights) were offered by defendant as promotional incentives to entice donors like plaintiffs to give generously to its campaign. Under these circumstances, it can reasonably be argued that returning the gift is the most lenient sanction defendant may receive from a menu that includes breach of fiduciary duty and civil fraud.

Returning to the issue before us, the parties have not cited, and we have not found through our own independent research, a published opinion in this State directly addressing the right of a live donor to demand the return of a conditional inter vivos gift based on the recipient's failure to honor the donor's conditions. We will thus approach this question guided

by our collective jurisprudential experience and general sense of fairness.

Based on the unquestioned realization that the recipient accepted the gift fully aware of the donor's conditions and did not express any reservation to the donor about its ability to meet those conditions, we conclude that this created a reasonable expectation in the donor's mind that: (1) the recipient would attempt to meet those conditions in good faith; (2) absent the donor's consent, the recipient did not have the right to ignore or disregard any of the material conditions of the gift; and (3) if the recipient of the gift decides to unilaterally disregard the donor's expressed condition, basic fairness dictates that the gift must be returned to the donor.

This analytical paradigm is also consistent with the principles governing a fiduciary relationship. As the Court noted in <u>F.G. v. McDonell</u>, 150 <u>N.J.</u> 550, 563 (1997), "[t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." Here, plaintiffs placed their trust in SAVE to meet the conditions of their gift. By virtue of their control of the funds, SAVE was in a superior position to determine to either meet plaintiffs' conditions, request their consent to rededicate

the funds to another purpose acceptable to plaintiffs, or return the gift.

By opting to disregard plaintiffs' conditions, SAVE breached its fiduciary duty to plaintiff. Under these circumstances, requiring SAVE to return the gift appears not only eminently suitable, but a mild sanction. After all, it can be argued that not every donor who may have cause to question the reasonableness of a charity's actions has the tenacity and wherewithal to pursue a claim. Furthermore, depending on the amount of the gift involved, some donors may come to the conclusion that initiating legal action is not a cost-effective means of obtaining redress.

Here, the trial court denied plaintiffs' application for prejudgment interest and plaintiffs opted not to seek appellate review of this decision by way of cross-appeal. We therefore decline to address this issue.

We do note SAVE's alternative arguments under the so-called cy pres doctrine, (which translates as "as near as may be"), also referred to as equitable deviation. As expressed by the then court of equity in McKenzie v. Trustees of the Presbytery of Jersey City, 67 N.J. Eq. 652, 672-73 (N.J. 1905):

> The doctrine of cy pres is therefore the
> doctrine of nearness or approximation, and
> it appears in English jurisprudence in three
> separate departments, yet with similar

operation and effect. Firstly, in the law of testaments, where a personal legacy has been given upon a condition precedent, and the literal performance of this condition has become impossible from unavoidable circumstances and without fault of the person to be benefited. Here, it is sufficient if the condition be performed as nearly as it can be. Secondly, in the law of private trusts, where lands are limited to an unborn person for life, with remainder to his first and other sons, successively, in tail. Here, in order to secure the flowing of the testator's bounty to the issue, the limitations may be held to create an estate in tail in the first taker. Thirdly, in the law of charitable trusts, where gifts have been made for charitable purposes which, either originally or in the course of time, cannot be literally executed. Here the gift will be administered, as nearly as may be, according to the donor's purpose, under general rules of law. In all of these instances it is to be observed that the underlying principle is this: Where the testator or donor had two objects in view -- one primary or general, and the other secondary or particular -- and these are, literally speaking, incompatible, the particular object must be sacrificed in order that effect may be given to the general object, according to law, and "as near as may be" to the testator's or donor's intention. Again, the principle may be more briefly stated as that of applying property, as nearly as possible, according to the donor's intentions, when those intentions cannot be exactly carried out.

[(Citations in original omitted).]

Relying on these ancient principles of probate law, SAVE argues that the trial court "should not have allowed plaintiffs' gift to fail." According to SAVE, Judge Sumners should have

A-0643-10T3

applied plaintiffs' donation to a charitable purpose "as nearly as possible to the particular purpose." SAVE's argument in this respect crumbles under the weight of its own logic. As emphasized repeatedly by the court in McKenzie, in the law of charitable trusts, where the gift has been made for a charitable purpose, and either originally or in the course of time cannot be literally executed, the gift will be administered, as nearly as may be, "according to the donor's intentions." Ibid. (emphasis added).

Under the facts presented here, it would be a perversion of these equitable principles to permit a modern charity like SAVE to aggressively solicit funds from plaintiffs, accept plaintiffs' unequivocally expressed conditional gift, and thereafter disregard those conditions and rededicate the gift to a purpose materially unrelated to plaintiffs' original purpose, without even attempting to ascertain from plaintiffs what, in their view, would be "a charitable purpose as nearly possible" to their particular original purpose.

Finally, we categorically reject SAVE'S so-called public policy argument. According to SAVE, if we permit Judge Sumners's decision to stand, "New Jersey charities will risk losing contributions committed to them merely because they take longer than anticipated to raise funds needed to build a new

facility or start a new initiative."  This "parade of horrible consequences" argument is based on mere speculation and is not rooted to the salient facts of this case.

Plaintiffs did not demand the return of their $50,000 donation because SAVE's Herrontown Road, state-of-the-art animal welfare facility designed to serve the Princeton region took longer to build than anticipated, or because SAVE decided to start a new initiative.  Plaintiffs demanded the return of their money because SAVE unilaterally decided to violate the expressed conditions of their gift.  We believe that responsible charities will welcome this decision because it will assure prospective donors that the expressed conditions of their gift will be legally enforceable.  Thus, the trust relationship necessary to promote generous gift giving has been strengthened by the tenacious efforts of two people who love large dogs and older cats.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0643-10T3

# SAVE
*Princeton's Animal Shelter*
established 1941

## Naming Opportunities

---

The Facility:
☐ Building ($1,000,000) -- Funded
☐ Vestibule ($10,000) -- Funded
☐ Lobby ($20,000)

---

Spay/Neuter Clinic:
☐ Surgery Suite ($250,000)
☐ Lab/Pharmacy ($100,000)
☐ X-Ray Room ($65,000)

☐ Preparation Room ($55,000)
☐ Veterinarian Offices ($30,000)

---

Administrative Support:
☐ Administrative Wing ($100,000)
☐ Board Room ($20,000) -- Temporarily held

---

Education Wing:
☐ Auditorium ($50,000)
☐ A/V Room/Computer Lab ($25,000)
☐ Catering Room ($15,000)

☐ Education Offices ($35,000)
☐ Humane Library ($25,000)

---

Recovery/Rehabilitation:

Canine Recovery:
☐ Canine Rehab Room ($25,000)
☐ Canine Rehab Room ($25,000)
☐ Vet Exam Room ($15,000)
☐ Hospital ($25,000)
☐ Isolation ($25,000)
☐ Isolation ($25,000)
☐ Grooming ($15,000)

☐ Maternity/Puppies ($35,000)
Feline Recovery:
☐ General Rehab ($50,000)
☐ Quarantine Cages ($50,000)
☐ Quarantine work room ($15,000)
☐ Vet Exam Room ($15,000)
☐ Long-term, chronic, feral ($25,000)

---

Adoption:
☐ Canine Living Room ($20,000) -- Funded
☐ Canine Living Room ($20,000) -- Funded
☐ Canine Living Room ($20,000) -- Funded
☐ Feline Living Room ($20,000) -- Funded
☐ Kitten Living Room ($25,000) -- Funded
☐ Kitten Living Room ($25,000) -- Funded
☐ Canine Play Space ($50,000)

☐ Canine get-acquainted room ($15,000)
☐ Feline get-acquainted room ($15,000)
☐ Puppy corrals ($25,000) -- Funded
☐ Puppy night cages ($15,000)
☐ Large Canine Run ($25,000) -- Funded
☐ Cage display room for felines ($25,000) -- Funded
☐ Adoption support areas ($50,000)

---

Other Shelter Support:
☐ Laundry ($20,000)

---

*\*\*Additional Naming Opportunities are available.  All gifts of $1,000 or more will be recognized on our donor wall.\*\**